WILHELM FLEGE v. STATE OF NEBRASKA.

FILED MAY 17, 1913. No. 17,608.

1. **Criminal Law:** APPOINTMENT OF ASSISTANT PROSECUTOR. Where, in a criminal prosecution, an application is made to the district court for the appointment of an assistant prosecutor, if the court finds that such an appointment should be made, no attorney should be appointed who is known to be a partisan as against the accused, and who has theretofore been employed and paid by

another suspected person, and for whom he has appeared in the preliminary examination and in a former trial of the accused in the district court, taking an active part in both trials for the purpose of protecting his suspected client. Under such an appointment, a fair and impartial trial of the accused person could not be reasonably expected.

2. ———: IMPANELING JURY: CHALLENGE FOR CAUSE. The statute (criminal code, sec. 468) provides that, where a proposed juror in a criminal prosecution has read the testimony of the witnesses, and upon which he has formed or expressed an opinion as to the guilt or innocence of the accused, he is incompetent as a juror. Where that fact is made clearly to appear, and that the opinion is still retained, it is manifest error to overrule a challenge for cause. Upon this subject there is no discretion lodged in the court. The statute is mandatory, and no court has the right to ignore it.

3. ———: EVIDENCE: ADMISSIBILITY. "An accused in a criminal prosecution is entitled to a trial upon competent, relevant evidence; evidence which at least tends to establish his guilt or innocence; and evidence which has no such tendency, but which, if effective at all, could only serve to excite the minds and inflame the passions of the jury, should not be admitted." *McKay v. State*, 90 Neb. 63. Therefore, when material evidence, such as the bloody and soiled clothing of a decedent, is admitted in evidence in a prosecution for murder, it should appear during the trial that the evidence would tend to throw light upon some material inquiry in the case. If not, it should be rejected.

4. ———: ———: EXPERT EVIDENCE. "Expert evidence in cases where the subject of discussion is on the border line between general and expert knowledge, as in questions of value, is not conclusive upon court or jury, but the latter may draw their own inferences from the facts, and accept or reject the statements of experts; but upon questions involving a highly specialized art, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence." *Ewing v. Goode*, 78 Fed. 442.

5. ———: INSTRUCTIONS: HOMICIDE. An instruction, which informs the jury that if they "believe the defendant not guilty, and that he did not shoot and kill" the decedent, they should acquit, ought not to be given, although in the same instruction they are informed that they must find the accused guilty beyond a reasonable doubt before they could convict him. It is not necessary that the jury should believe the act was not committed by him. It devolved upon the state to prove he *did* commit the crime charged beyond a reasonable doubt.

ERROR to the district court for Thurston county: GUY
T. GRAVES, JUDGE. *Reversed.*

*J. J. McCarthy* and *Berry & Berry,* for plaintiff in error.

*Grant G. Martin, Attorney General, Frank E. Edgerton* and *C. A. Kingsbury, contra.*

REESE, C. J.

This is the second time this case has been presented to
this court. The opinion upon the former hearing is re-
ported in 90 Neb. 390, where the material facts presented
by the evidence on the part of the state are quite fully
stated, and need not be here repeated. After the cause was
remanded to the district court, the venue was changed to
Thurston county, where a trial was had, and the cause
submitted to the jury on practically the same evidence on
the part of the state as at the former trial. The jury re-
turned a verdict finding plaintiff in error, who will here-
after be referred to as defendant, guilty of manslaughter,
when the indeterminate sentence of the law was pro-
nounced against him. He brings error to this court, as-
signing 290 alleged errors of the district court in con-
nection with the proceedings and trial. The assignments
are specific, and many are well founded, but it will be
impossible for us to discuss them without extending this
opinion to an unnecessary and unreasonable length. Par-
ticular attention can be given to comparatively few of
them.

It appears from the record, and, as shown by our former
opinion, that the principal witness on the part of the
state, one Albert Eichtencamp, who testified to having
seen defendant kill his sister, Louise Flege, had testified
to a different state of facts at the coroner's inquest, the
effect of which was the complete exoneration of defendant.
While the witness was never arrested nor charged in any
legal proceeding with the commission of the crime, there
appears to have arisen a known suspicion on the part of

some that he might be the guilty party. He and his relatives employed an attorney to assist in the prosecution of defendant at the preliminary trial and upon the former trial in the district court, evidently under the belief that the conviction of defendant would remove all suspicion from Eichtencamp. The attorney appeared and took an active part in the prosecution at the two trials, and was paid for his services by Eichtencamp and his relatives. After the cause was removed to Thurston county, the state was represented by the county attorney of Dixon county and the county attorney of Thurston county, when application was made to the court for the appointment of Eichtencamp's former attorney to assist the two county attorneys in the prosecution of the case in the approaching trial. The application was resisted upon the ground that the attorney's former employment as a private prosecutor, employed by Eichtencamp, rendered him an improper person to have charge, or any part, in the prosecution, the purpose of which was for the protection of Eichtencamp. The attorney was called to the stand, and candidly stated his relations with Eichtencamp, which continued up to the close of the former trial, which resulted in the conviction of defendant. The objection of defendant was overruled, the appointment made, and the attorney entered upon and took an active part throughout the trial, making, to say the least, a vigorous argument to the jury, which in some respects we cannot approve. While we intend no personal reflections upon the attorney, yet we do not hesitate to say that the appointment should not have been made, and that it was prejudicial error to make it. It is impossible to conceive of an attorney, after having served Eichtencamp as he had, and for the purpose for which he had been employed, to enter upon the trial with the single purpose of impartially seeking to know the truth, protecting the rights of defendant, and seeing that they were maintained, if need be, at all hazards. Not only this court, but all courts, have so clearly stated the judicial duties of a public prosecutor as

to leave no room for doubt as to the entire impartial attitude of a prosecutor, so as to leave no room for question upon this point. In *Liniger v. State,* 85 Neb. 98, we said: "Public prosecutors and peace officers owe no greater obligation to the public than to a defendant charged with crime, and they should as zealously protect the one as the other." This being true and maintained by all courts, it must appear to the mind at once that the appointment of a partisan special prosecutor was not in the interest of the fair and impartial trial guaranteed by the constitution. The obligation of an attorney to his client, when once employed in a particular case or matter, can never be shaken off. It is a perpetual obligation which abides to the end of life, unless, in a proper case, waived by the client. With this obligation resting upon the memory of a conscientious lawyer, as the appointee, no doubt, was and is, it would be impossible for him to forget his sworn duty to his former client, and there would be a constant inclination to ask of himself, "What effect will this evidence, or argument, have upon the rights of my first client, to whom I am still bound by every principle of law and honor? I should be faithful to my trust and protect Eichtencamp in every way possible. If defendant is convicted, Eichtencamp is forever cleared of the suspicion resting against him." We are forced to the conclusion that no honest and conscientious attorney could be able, nor should he, if he could, withstand such an appeal.

Error is assigned upon the ruling of the court wherein certain jurors were challenged for cause while being examined upon their *voir dire* as to their competency and qualification as such jurors. John D. Girardot was called as a proposed juror. His examination is of too great length to be set out in full. He testified that he had read of the case from the time of the murder to the time of being called as a juror, and had in the meantime conversed with his family and others about it; that he was "real certain" that he had formed an opinion as to the guilt or innocence of the defendant; that probably it was more of

an impression than an opinion; that, if selected as a juror, he would try to give the defendant a fair and impartial trial; that the reports which he read in the newspapers published the testimony of the witnesses, all of which he read, consisting of a couple of columns each day, and upon which he formed an opinion, which he yet retained, and which would take strong evidence to remove; that he could not lay aside that opinion without some reason for it and evidence to cause the change; that he was afraid he could not lay that opinion aside until he had some evidence to change it. "Q. You think evidence might change it, do you? A. Yes; good, strong evidence I reckon would change it." The juror was challenged for cause, the challenge overruled, and the juror excused on defendant's peremptory challenge.

August Lindgrand, another proposed juror, testified that he had read the published testimony of the witnesses who were examined at the former trial "from beginning to the end," and upon that evidence he formed an opinion as to the guilt or innocence of the defendant; that he had never changed that opinion; that it would take considerable evidence to change it, as it was a fixed opinion; that he would have to have "a pretty good reason" for changing his mind. He was challenged for cause, the challenge overruled, and the juror excused on a peremptory challenge.

J. W. Twyford, another proposed juror, testified that he read the Sioux City Journal, which published daily reports of the evidence and the testimony of the witnesses at the former trial, which he read, and upon which he formed an opinion of the guilt or innocence of the defendant, and which he would not change until he had some reason for changing it. He was challenged for cause by the defendant, the challenge overruled, and the juror excused on defendant's peremptory challenge.

Wilson W. Waters, upon his examination, testified that he had read the reports of the former trial and the testimony of the witnesses in the Sioux City Journal, on which

he formed an opinion as to the guilt or innocence of the defendant; that he retained that opinion, could not change it without having some reason to change it, certainly would not; that in his present state of mind, if retained as a juror, if no evidence was introduced his verdict would be guilty, resting upon the opinion which he then had, and would continue to believe him guilty until he had sufficient evidence to change his mind, which he could not do until he had evidence to cause the change. The defendant's challenge for cause was overruled, the juror retained, and he signed the verdict of the jury as foreman.

Thomas Conley, examined on his *voir dire,* testified that during the former trial the testimony of the witnesses was published in the papers, and that he read the testimony, and upon that he formed an opinion as to the guilt or innocence of the defendant, deciding the case in his own mind; that he had never had any occasion to change his mind since that time, and had that opinion still; that it was a definite opinion to a certain extent; that he could not lay that opinion aside before hearing the evidence; that it would be impossible to divest himself of that opinion without hearing the evidence; that, if accepted as a juror, he would enter upon his duties with that opinion in his mind, and it would require evidence to remove it. The juror was challenged for cause, the challenge overruled, and he was excused on defendant's peremptory challenge.

Exceptions were taken to the ruling in each case. Counsel for the state examined each juror at length, as also did the court, when they testified that they thought they could render a fair and impartial verdict without reference to the opinion thus formed. The defendant exhausted all his peremptory challenges, being required to deplete the number to which he was entitled by law by challenging the incompetent jurors. The jurors seemed to be candid and conscientious in their answers; but the fact that they so answered was not enough to render them competent.

It is provided in section 468 of the criminal code: "The

following shall be good causes for challenge to any person called as a juror on the trial of any indictment: * * * 2d. That he has formed or expressed an opinion as to the guilt or innocence of the accused; provided, that if a juror shall state that he has formed, or expressed, an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror as to the ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments, or reports, or upon rumor, or hearsay, and not upon conversations with witnesses of the transactions, or reading reports of their testimony, or hearing them testify, and the juror shall say, on oath, that he feels able notwithstanding such opinion to render an impartial verdict upon the law and the evidence, the court, if satisfied that said juror is impartial, and will render such verdict, may, in its discretion, admit such juror as competent to serve in such case." It will be readily seen that, where the opinion is formed from "reading reports of their (the witnesses) testimony," the juror does not come within the proviso, and is incompetent, without reference to what he may say as to his ability to render an impartial verdict, or what influence his preconceived opinions might have upon his judgment in weighing the evidence.

In *Carroll v. State,* 5 Neb. 31, we held that, if it appear that the juror has formed an opinion from reading reports of testimony of witnesses, he is incompetent, although he may be willing to swear that, notwithstanding such opinion, he feels able to render an impartial verdict, and the judgment was reversed solely upon the one ground with reference to but one juror.

In *Curry v. State,* 4 Neb. 545, it is said: "We think it is clear that where the ground of challenge is the formation, or expression, of an opinion by the juror, before the court can exercise any discretion as to his retention upon the panel, it must be shown by an examination of the juror, on his oath, not only that his opinion was formed

solely in the manner stated in this proviso, but, in addition to this, the juror must swear unequivocally" to his ability to render a fair and impartial verdict upon the law and evidence. As an opinion formed from reading the report of the testimony of the witnesses is excluded from the proviso, it is as clear as the English language can make it that the district court had no discretion in the matter whatsoever, but its plain duty was to sustain the challenge. The jurors were wholly incompetent. Such has been the plain provision of the statute since the early days of the judicial history of the state, and the courts have recognized its binding force. Why the statute was ignored is not a question with which we have to deal. The constitution guarantees to every man a fair trial by an impartial jury. That a juror could be considered impartial, who had read the evidence of the witnesses on a former trial, and formed an abiding opinion thereon, and could by any effort on his part disrobe himself of that opinion, is not within the reach of human nature, and hence the statute absolutely disqualifies him. See *Smith v. State,* 5 Neb. 181.

The defendant exhausted his peremptory challenges, and therefore did not waive his constitutional and statutory rights. *Thurman v. State,* 27 Neb. 628; *Kennison v. State,* 83 Neb. 391; *Brinegar v. State,* 82 Neb. 558; *State v. Brown,* 15 Kan. 400.

During the introduction of the testimony, the state offered in evidence the clothing worn by the decedent at the time of her death, consisting of her dress, chemise, sun-bonnet and apron, in their soiled, burnt and bloody condition. Those exhibits were objected to by the defense as incompetent, irrelevant and immaterial, not tending to establish any issue or fact in the case, nor tending to prove defendant's guilt, but only for the purpose of inflaming the jury. The objection was overruled, the garments, admitted in evidence over defendant's exceptions, were displayed and held up before the jury. Error is assigned upon this ruling. There are, no doubt, many in-

stances in which there is no error in the admission of such
articles in evidence.   Sometimes it becomes necessary for
the state to prove the proximity of the firearm to the
wound made by the ball, and this may be done by showing
the burnt condition of, or powder stains upon, the cloth-
ing.   In other cases it may be necessary to prove the rela-
tive locations of the victim and person using the firearm.
This may often be shown by the range and course of the
ball in passing into or through the clothing and body of
the decedent.   It is also permissible if it tends to prove
the identity of the person killed, or of the slayer.   But
some necessity for this class of evidence should appear to
justify its admission.   This involves the exercise of dis-
cretion on the part of the trial court.   There is nothing
in the record showing that the exhibition of the bloody
and burnt garments was a proper, or necessary, part of
the state's case.   The court adheres to the holding in *Mc-
Kay v. State*, 90 Neb. 63, 91 Neb. 281, that if it appears
that the introduction of the blood-stained garments was
for the purpose of arousing the passions of the jury, and
by that means securing a conviction, the practice should
be condemned and a judgment of conviction reversed.
Unless it appears that the offered evidence would be ma-
terial to some inquiry in the case on trial, such exhibits
should be excluded.   See *Cole v. State*, 45 Tex. Cr. Rep.
225, 75 S. W. 527; *Christian v. State*, 46 Tex. Cr. Rep. 47,
79 S. W. 562; *Melton v. State*, 47 Tex. Cr. Rep. 451, 83
S. W. 822; *Williams v. State*, 61 Tex. Cr. Rep. 356, 362,
136 S. W. 771; *Lucas v. State*, 50 Tex. Cr. Rep. 219, 95 S.
W. 1055.   In 2 Wharton, Criminal Evidence (10th ed.)
sec. 941, it is said: "As clothing is in the nature of de-
monstrative evidence, it has a strong tendency to arouse
feelings of prejudice or passion, and unless the articles so
introduced serve the purpose of identifying the deceased.
or of honestly explaining the transaction, the introduction
is irrelevant, and constitutes prejudicial error; and par-
ticularly is this true when it is displayed in such manner
as to arouse prejudice and passion."

On the part of the defense, Dr. Meis, of Sioux City, Iowa, Professor Walter S. Haines, of Rush Medical College, Chicago, and Professor Ludvig Hektoen, of the same place, were called as expert witnesses. It is shown beyond dispute or contradiction that, at or about 12 o'clock on the day of the homicide, the decedent ate her usually hearty dinner, consisting of a variety of food. If the testimony of Eichtencamp is true, she was slain about one hour thereafter, or about 1 o'clock P. M. A post mortem examination was had some time that evening or early the next morning. The body was embalmed and buried. Some considerable time thereafter, a number of months, the body was exhumed and found to be in a good state of preservation, the stomach removed, and the contents sent to Professor Haines for analysis. It was agreed by all that the wound in the head would, and did, produce instantaneous death. The experts testified that at death all digestion of food taken into the stomach immediately ceased. The analysis disclosed that the contents of the stomach were quite thoroughly digested, and it was shown that digestion would scarcely be commenced within one hour after eating, that it could not be advanced to the extent shown short of two and one-half to three hours thereafter, and therefore it was insisted that it was impossible that decedent could have been killed within one hour after eating the noon meal. The testimony of all the witnesses on that part of the case agrees that, about 1 o'clock on the day of the homicide, the defendant left his home, and did not return until late in the afternoon, and after the discovery of the body of the decedent. After a somewhat careful examination by questions and answers, certain hypothetical questions were asked and answered by which the testimony of the experts was further elucidated. We have examined the evidence with care, and are unable to discover where the hypothetical questions varied in any material degree from the testimony, and especially from the evidence and theory of the defense. The experts were men of high standing in their profession

and of known probity of character. In instructing the jury, the court gave the fifteenth instruction, as follows:

"You are not to take for granted that the statements contained in the hypothetical questions which have been propounded to the witnesses are true. Upon the contrary, you are to carefully scrutinize the evidence, and from that determine what, if any, of the averments are true, and what, if any, are not true. Should you find from the evidence that some of the material statements therein contained are not true, and that they are of such character as to entirely destroy the reliability of the opinions based upon the hypothesis stated, you may attach no weight whatever to the opinions based thereon. You are to determine from all the evidence what the real facts are, and whether they are correctly or not stated in the hypothetical question or questions. I need hardly remind you that an opinion based upon a hypothesis wholly incorrectly assumed, or incorrect in its material facts, and to such an extent as to impair the value of the opinion, is of little or no weight. Upon the matters stated in these hypothetical questions, and which are involved in this investigation, you are to give the defendant the benefit of all reasonable doubt, if any there should be, and where there is a reasonable doubt as to the truth of any one of the material facts stated, resolve it in the defendant's favor."

As an abstract proposition of law, this instruction may be, in the main, unobjectionable, and might be properly given in a case to which it should be applied, but we are unable to see where or how it could have any just application to this case. As a general rule the principle involved in this instruction is recognized as applying to the testimony of experts upon questions in which most people have what might be denominated common knowledge, and when such testimony is presented to the jury, or other trier of fact, who may have opinions of their own derived from common experience and observation; and, if an expert gives an opinion which is at variance with that common knowledge or ex-

perience, the juror is allowed to make use of his own knowledge, intelligence and judgment in weighing the testimony of the expert. But this rule does not apply in its entirety where the substance of the testimony is upon a subject not understood or known by the layman, and the testimony is confined to purely scientific investigations and close application with which others than those making the investigations have no knowledge. As said by Judge Taft in *Ewing v. Goode*, 78 Fed. 442: "In many cases, expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts, and accept or reject the statements of experts; but such cases are when the subject of discussion is on the border line between the domain of general and expert knowledge, as, for instance, where the value of land is involved, or where the value of professional services is in dispute. There the mode of reaching conclusions from the facts when stated is not so different from the inferences of common knowledge that expert testimony can be anything more than a mere guide. But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must depend on expert evidence. There can be no other guide."

It cannot be denied that the question of post mortem digestion is one upon which the great majority of people have never thought and have no information whatever. This want of knowledge is not confined to laymen. It involves long, careful, patient and persistent investigation, and comparatively few have given the subject sufficient thought or investigation to enable them to speak with anything like exact knowledge thereon. As said in the quotation above given, there can be no other guide than the knowledge of those who have made the subject a matter of special study. True, the jury may bring to their aid such knowledge and experience as they may have

upon the subject in hand, but, in the absence thereof, they would not be justified in ignoring the testimony of fully qualified experts. The subject is one which the layman, the lawyer, the judge, and even the physician, is not called upon to investigate as fitting him for his profession or station in life. It is safe to say that not one person in thousands has given the subject any investigation or thought. Courts and jurors are usually totally in the dark thereon, and must depend upon the researches of those who have made the subject one of special investigation and upon which they are qualified to give correct opinions. The expert witnesses were men of known competency and standing in their profession, and upon such the courts must, to a great extent, depend for their guidance when considering questions of the kind under consideration. It must also be observed that, as shown by the bill of exceptions, much the greater portion of the testimony of the experts was not given upon hypothetical questions, but upon direct questions containing no statement of facts, hypothetical or otherwise, to which they responded by the statement of facts resulting from their researches and investigations. The instruction is almost a literal copy of one given in the trial of *Guetig v. State,* 66 Ind. 94, wherein the instruction was approved. In that case the question of the insanity of the accused presented the principal defense. The difference in the quality of the subjects under investigation must be apparent to every thinking mind. On the question of the sanity of an individual the inquiry is not limited to the testimony of expert witnesses, but the nonexpert, who has observed the conversation, conduct and bearing of the accused, is as competent to testify as the expert. This cannot be true upon the subject of post mortem digestion. Upon this subject no one but the expert is qualified to testify at all. As said in Lawson, Expert and Opinion Evidence (2d ed.) 285: "It is safer, on the whole, to trust to the judgment of learned men, acquired by study, observation and skill, than to the imperfect deductions of jurors, hastily

derived from readings not familiar to them, unassisted by study, examination and comparison of kindred subjects. * * * Great respect should be accorded to the views of such a class of witnesses." It must appear to any thinking mind that the instruction was too general, as applying to all cases, and a regard to the due administration of justice would require greater care and discrimination in an instruction upon a question of this kind.

By the sixteenth instruction the jury are permitted to "accept or reject such opinions, as you may accept as true, or reject as false, any other facts in the case. The jury are instructed that the opinions of the witnesses as experts are merely advisory and are not binding on the jury, and the jury should accord to them such weight as they believe, from the facts and circumstances in evidence, the same are entitled to receive." The testimony of the experts explained to the jury the process of digestion, the combination of gases and acids which entered into the process, the necessity for vital action in order that the fluids be secreted by the stomach, but which instantly ceased upon death. All this was carefully stated and explained, without contradiction or dispute, and which the very nature of the testimony would naturally convince the minds of the jury of its truth, yet the jury were informed that they might ignore it all, without a syllable of evidence calling it in question, and, necessarily, without any knowledge or experience on their part by which it might be compared or tested. The jury evidently took the court at its word and arbitrarily cast the proof aside as not worthy of belief.

In the twenty-third instruction the jury were informed that defendant denies the killing of the decedent, and claims that she was not killed until after he left his home on the day of the homicide; "and, if you believe the defendant not guilty, and that he did not shoot and kill the said Louise Flege, as alleged in the information, or in the event that the evidence introduced in the case is so evenly balanced that you cannot tell whether defendant or some

other person shot and killed the deceased, as alleged, then you should acquit the defendant, or if you entertain any reasonable doubt of the guilt of the accused of the crime charged in the information then you should give the defendant the benefit of such doubt and acquit him." This instruction is objectionable in several particulars: First, if the jury believe the defendant not guilty, they should acquit; second, if they believe he did not shoot and kill the decedent, they should acquit him; third, if the evidence is evenly balanced, they should acquit; fourth, if they cannot tell whether defendant or some other person committed the crime, they should acquit; or fifth, if they have any reasonable doubt of his guilt, they should acquit. We know of no rule of law that requires the jury to "believe the defendant not guilty," or that he "did not shoot and kill" the decedent, before they could acquit. The burden is on the state to prove his guilt beyond a reasonable doubt, and this part of the instruction, as well as others, except the last clause, should not have been given. It could only confuse the jury, and possibly cause them to believe that they must "believe" him "not guilty," and believe he "did not shoot and kill" decedent, before they could acquit.

In the twenty-sixth instruction the jury were again informed that "if you find that he did not shoot the said Louise Flege, or entertain a reasonable doubt of his guilt, you should acquit him." Here is a repetition of the same vice. It was not necessary that the jury should find that he did not commit the deed. The question to be decided was: Has the state proved beyond a reasonable doubt that he did?

A sharp criticism is made against the conduct of counsel for the state in the closing argument to the jury, but, as that attorney will appear no further in the case, the contention need not be further considered. There is also complaint as to the conduct of other counsel for the state. As it is hardly probable that the objectionable language, which we need not specify, will be repeated on another

43

trial, it is thought that it need not be further noticed, Prosecuting officers should always remember that it is not so much their duty to secure convictions as to present the truth without indulging in crimination or recrimination or personal abuse of an accused. If unjust practice is indulged in, the court should repress all such efforts with a firm hand. The constitution and laws guarantee to every person a fair trial. It is the duty of the courts to see that this guaranty is fulfilled. *People v. Davenport,* 13 Cal. App. 632, 110 Pac. 318; 12 Cyc. 571; *McKay v. State,* 90 Neb. 63, 74; *Nickolizack v. State,* 75 Neb. 27, 32; *Wilson v. State,* 87 Neb. 638, 649; *Leahy v. State,* 31 Neb. 566; *State v. Irwin,* 9 Idaho 35, 60 L. R. A. 716; *Bailey v. People,* 130 Pac. (Colo.) 832.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

ROSE, J., dissenting.

The state in employing counsel in criminal cases will be unnecessarily and injuriously hampered by the rules announced. The successful prosecution of a guilty defendant in a contested case depends in a large measure upon the learning, skill and energy of prosecuting attorneys. A county cannot be expected to elect a prosecutor prepared at all times, without assistance, for every legal combat. Many eminent courts hold that the power to employ attorneys to prosecute persons charged with felonies is inherent in sovereignty. 30 Cent. L. J. 344. In the employment of counsel the county attorney, with the consent of the court, acts for the state. The trial judge, who is impartial in the contest, is acquainted with local attorneys and can readily acquaint himself with the character of the services demanded in each particular case. Accused was defended by gifted lawyers. They are capable of emotional advocacy. They are not strangers to science or philosophy. They brought to their client not only their own zeal and accomplishments, but they searched the

mysterious processes of nature in his behalf, and enlisted the services of a chemical analyst possessing perhaps the highest possible degree of human skill. Their conduct was commendable, and accused, in being thus fortified, was strictly within his rights. In the presence of such adversaries is the sovereign obliged to employ impartial counsel who will confront them in obsequious humility? If so, the case might as well have been dismissed at the start. I believe in the doctrine that "the forensic contest should be fought with something like a just equality of opposing forces." 30 Cent. L. J. 344. Any capable, upright lawyer who will conduct himself properly under the directions of the court may properly be called to assist in the prosecution. Counsel for defendant are partisans. The jury and the judge must be unprejudiced and impartial, but disinterested complacency should not be exacted of counsel for the state. Both the trial and the reviewing court should, in the midst of the legal storm, make rulings and enforce the law unaffected by sentiment or emotion, but the prosecutor should not be required to conform to that standard of official conduct. Reviewable error must be predicated upon a ruling of the trial court. Unless the assistant prosecutor was guilty of some prejudicial act during the trial, no possible harm resulted from the order overruling the objections to his employment. An erroneous and prejudicial ruling in regard to a specific act of misconduct is essential to a reversal on that ground. Such a ruling has not been specifically pointed out by the majority. The criticism of the trial court and of the assistant prosecutor in this respect is, in my opinion, unmerited.

An attorney is not bound by any duty to advocate the punishment of the innocent for the purpose of shielding a guilty client. No lawyer worthy of his profession ever recognized such a tie, either before or after employment. Happily, the thirst of religious bigots and of political tyrants for human blood has not crept into our institutions. The fears formerly inspired by such abominations

should therefore be laid to rest with the odious conditions under which they were begotten. Owing to human frailties, juries, prosecuting attorneys and trial courts may err, but the present record does not show any disposition on the part of those who participated in this trial to shed innocent blood under the forms of the law. The duty of the trial court is not confined to enforcing the right of defendant to a fair and impartial trial. There is an equal duty to see that the state has a lawful opportunity to establish its charge against accused. The violation of one duty wrongs the individual. The violation of the other wrongs society as a whole. The district judge is appointed by the constitution to be the arbiter between the individual and society collectively. In a criminal prosecution he sees the conditions as they arise. Any rule which improperly interferes with his discretion weakens his power and impairs the efficiency of the tribunal over which he presides. Rulings which have an unnecessary tendency to discourage and humiliate prosecuting officers in the performance of their duties, to weaken the power of the state, and to lessen respect for criminal tribunals, should be avoided.

I adhere to my dissent from the bloody-garment rule announced in *McKay v. State,* 90 Neb. 63, 91 Neb. 281, and followed in this case. It attaches too much importance to shadow, and too little to substance. The passions of sensible men who sit on juries play too tragic a part in records for review.

In my opinion the effect of the expert testimony, under all the circumstances of the case, was a question for the jury. It is not conclusively established by the evidence that decedent's stomach went into the hands of the analyst as nature left it. It had previously been opened and examined. It may fairly be inferred from the evidence that part of the contents was missing. That part analyzed may have been eaten in the forenoon. The report of the analyst, therefore, does not annihilate the direct evidence of defendant's guilt. If Science is to pronounce the decree

of Omnipotence in a criminal prosecution, the hypotheses adopted by the scientist should be free from infirmities like those mentioned.

LETTON, J., dissenting.

I cannot agree with the opinion on the following points:

1. The scorched and burned garments directly corroborated the testimony of Eichtencamp, and, therefore, tested by the very rule announced in the opinion, were properly admitted in evidence.

2. As pointed out by Judge ROSE, the expert evidence, under the circumstances in this case, was not conclusive as to the length of time that elapsed after the deceased ate a meal and before her death. While the principle of law quoted from Judge Taft is correct, it is not strictly applicable here.