Muzik v. State.

---

## EMIL MUZIK V. STATE OF NEBRASKA.

FILED MARCH 4, 1916. No. 19362.

1. **Criminal Law: Evidence: Exhibits.** *McKay v. State*, 90 Neb. 63, and *Flege v. State*, 93 Neb. 610, examined, and *held*, that the rule announced in paragraph 7 of the syllabus in the former, and in paragraph 3 of the syllabus in the latter, does not, and was not intended to apply to facts or exhibits which tend to prove or disprove the guilt or innocence of the accused, or his sanity, or the degree of his crime.

2. ———: **Instructions: Insanity.** Instruction No. 15, examined and considered in the opinion, criticized as to form, but *held* to have fairly presented to the jury the law relating to the defense of insanity as applied to the evidence introduced at the trial.

3. **Homicide: Sufficiency of Evidence: Reduction of Sentence.** The evidence examined, its substance set out in the opinion, and *held*, sufficient to sustain the verdict of guilty of murder in the first degree, but insufficient to sustain the imposition of the death penalty.

ERROR to the district court for Douglas county: JAMES P. ENGLISH, JUDGE. *Sentence reduced.*

*J. E. Bednar* and *W. W. Hoye*, for plaintiff in error.

Muzik v. State.

*Willis E. Reed, Attorney General,* and *Charles S. Roe,* contra.

FAWCETT, J.

Plaintiff in error, whom we will designate as defendant, was convicted in the district court for Douglas county of murder in the first degree. The jury fixed the penalty of death, and sentence was pronounced accordingly. Defendant prosecutes error.

The assignments of error are: (1) The giving of instruction No. 15; (2) error in overruling defendant's motion for a new trial; (3) that the verdict is not sustained by sufficient evidence, is excessive, and was the result of passion and prejudice on the part of the jury.

The second assignment will first be considered. It is divided into three subheads, which are discussed together in the brief. The victim of defendant's deed was his wife. The crime was committed on the morning of March 5, 1915, and before Mrs. Muzik was fully dressed. The evidence shows that defendant at one time had been employed in the packing houses of South Omaha, but for more than a year preceding the tragedy had done no work of any kind; that Mrs. Muzik was earning the support of the family by her own labor. On the morning in question she chided the defendant for not getting up and starting a fire sooner, as she had to get to work. We give her own statement to her neighbor, Mrs. Smith, immediately after the tragedy. Mrs. Smith testified that about a quarter to 7 in the morning Mrs. Muzik came to her home carrying her child in her arms; that after she opened the door she "hollered;" that witness ran to meet her; that she was dressed only in her underwear, and had on one stocking and slipper, with a coat thrown around her. "She started to holler and call my name, call 'Mrs. Smith,' and I asked her what is the matter, and she says, 'Oh, my, Muzik cut me; cut my throat.' I says, 'Why?' * * * She says, 'I don't know.' I says, 'Did you have

a quarrel?' 'No,' she says, 'I just told him why don't he get up and start a fire sooner; I have to get to work.' And she says, 'He took me and put me on the floor and took a knife and cut me.'" The witness was then asked to describe the appearance of Mrs. Muzik at that time. In doing so she told how the blood was oozing through a cloth that she had around her neck, and how it had run down over her garments. Her testimony shows that Mrs. Muzik presented a decidedly bloody appearance. Other witnesses, who immediately visited the scene of the tragedy, described the condition and appearance of the room in which the deed was committed. This description was more or less graphic, one witness stating that it resembled a slaughter house. The knife with which the deed was committed was also introduced in evidence and exhibited to the jury. It was a thin-bladed, steel table knife, with a sharp edge, and was covered with blood.

In the opening statement to the jury at the beginning of the trial counsel for defendant admitted that defendant killed his wife, and urged insanity as his defense. It is now contended that, inasmuch as the killing was admitted, the testimony with regard to the bloody condition of Mrs. Muzik and the similar condition of the room where the deed was committed and the exhibition of the knife could serve no purpose in the case except to inflame the passions and excite the prejudices of the jury, and that under the rule announced in *McKay v. State,* 90 Neb. 63, and *Flege v. State,* 93 Neb. 610, their admission was prejudicial error. The rule announced in those cases is that in a criminal prosecution an accused is entitled to a trial upon competent, relevant evidence, evidence which at least tends to establish his guilt or innocence, and that evidence which has no such tendency, but which, if effective at all, could only serve to excite the minds and inflame the passions of the jury, should not be admitted. There is a clear distinction between those cases and the case at bar. In each of those cases there was no doubt that a deliberate, cold-blooded murder had been committed, and the only

question was the identity of the slayer. In the case at bar there was no question as to the identity of the slayer, but the questions before the jury were his sanity and the degree of his crime. The nature of the crime, the conditions surrounding it, the appearance of the parties, the kind of instrument used, would all tend to throw light upon the two important questions: First, was it a deliberate, premeditated killing which would make it murder in the first degree; and, second, was it made by one who was sane, or did it appear to be the work of an insane person? The rule announced in the *McKay* and *Flege* cases does not, and was not intended to, apply to a case like the one at bar.

Under the first assignment, numerous objections are made to instruction No. 15. These objections, while skilful, are hyper-technical to a degree which, while they might have availed in former years, no longer meet with favor in the appellate courts of the land. While it must be conceded that the instruction is considerably involved in its statement—so much so that we cannot commend its form and want of clearness—yet we are all agreed that, under the facts in this case, we cannot hold that it constitutes prejudicial error. Taken as a whole, we think it fairly presented to the jury the law relating to the defense of insanity generally, and particularly so under the evidence in this case. We are unable to see how the jury could have listened to it as it was read to them from the bench, or have examined it after retiring to deliberate on the case, without fully understanding that it imposed upon the state the burden of overcoming the evidence offered by the defendant to rebut the presumption of sanity by evidence establishing beyond a reasonable doubt that the defendant was, at the time of the commission of the offense with which he was charged, possessed of a mind that at such time discerned between moral right and wrong with reference to his act, and that at such time he did know the nature and quality of his act.

Was the evidence sufficient to sustain the verdict, and is the verdict so excessive as to show passion and prejudice on the part of the jury? As has already been stated, the killing was admitted, so that the only question really to be considered under this assignment is whether the verdict is so excessive as to show passion and prejudice. That it was a brutal murder is not denied; but it is urged that the defendant was insane at the time. The evidence on this point, briefly stated, is that after he quit working in the packing houses, more than a year prior to the tragedy, defendant remained in the house constantly, or so nearly so that his nearest neighbors never saw him outside but once or twice during that time. He would sit apparently musing, and would draw the blinds, either to shut out the light or to avoid observation from outsiders. Mrs. Muzik worked in a restaurant, and would bring his meals to him. The little seven-year-old daughter testified: "He cut my mamma's throat. Q. And what else did he do after he did that? A. He clapped his hands and ran outdoors. * * * He laughed and he clapped his hands." The testimony of those who knew the defendant as to his actions prior to the tragedy and to his actions and conversation immediately afterward, and the testimony of the chief of police, who had him in custody from the time of the tragedy until his victim died two days later, so clearly sustain the verdict of the jury finding the defendant guilty of murder in the first degree that we cannot set it aside.

We are, however, impressed with the conviction that the death penalty should not be imposed. There is enough in the evidence to show that, while the defendant understood and comprehended the nature of the deed committed, and understood and comprehended the difference between right and wrong, his mind was nevertheless abnormal. According to the statement of Mrs. Muzik immediately after the tragedy, he had several times threatened to kill her. It may be said that this was proof of premeditation; and so it would be in the case of a normal mind, but in the

present case it has some tendency to show an abnormal mind which for more than a year had been brooding over actual or fancied troubles.  The defendant was in good health, able to work, and, up to the time that he voluntarily imprisoned himself in his own home, he had, so far as the evidence shows, performed his duties as a husband and father to his wife and child.  It is hard to conceive of a man who is absolutely normal in all respects acting as the evidence shows the defendant acted during the last year or more before he committed this horrible crime. *Hamblin v. State,* 81 Neb. 148, 168, in many respects presents a similar situation to the one at bar.  We there stated that a solution of the motive which prompted the act was an impossibility; that we were fully persuaded that the defendant should never be given his liberty, for the reason that he would be a menace to those with whom he might associate.  In this case, as in that, the evidence tends strongly to convince us that, owing to defendant's mental condition, "there may be grave doubts as to his responsibility for his acts at the time of the tragedy, and yet he is neither an idiot, an imbecile, nor a maniac. We can find no justification for taking his life, nor should he ever be discharged from confinement."

Upon a grave consideration of the whole record, we feel constrained to hold that this case comes within section 9179, Rev. St. 1913, which provides that in all cases pending in this court on error we may reduce the sentence rendered by the district court when in our opinion the sentence is excessive, in which case it is made our duty to render such sentence against the accused as in our opinion may be warranted by the evidence.  Acting under the wise provision of that statute, the verdict of the jury in the district court, finding the defendant guilty of murder in the first degree, is affirmed, but that part of the verdict fixing the penalty at death and the judgment of the district court imposing the death penalty are reduced to life imprisonment.

The judgment of this court, therefore, is that the defendant be imprisoned in the state penitentiary at hard labor during his natural life, but without solitary confinement. As thus modified, the judgment is affirmed.

SENTENCE REDUCED.

LETTON and HAMER, JJ., not sitting.