WILLIAM BASSINGER V. STATE OF NEBRASKA.
5 N. W. (2d) 222

FILED AUGUST 7, 1942. No. 31370.

*Andrew P. Moran,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Herbert T. White, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and YEAGER, JJ., and ELLIS, District Judge.

SIMMONS, C. J.

The defendant was convicted of the first degree murder of William George and sentenced to life imprisonment. He appeals.

For the most part the facts are not in serious dispute. That the deceased was murdered is not questioned. The dispute comes as to whether or not the defendant committed the crime.

William George and his wife lived in what is described as a "shack" near the river front in Nebraska City. This building had willow poles for its framework, covered with burlap on the sides near the ground, wire screen above that and a tar paper roof. Cooking in good weather was done

outside. In the inside were two beds and other personal belongings. They had also a trailer which was parked nearby. George and his wife were uptown on the evening of September 11, 1941; they returned home and went to bed in the same bed about 10 or 11 o'clock. The wife slept on the inside near the wall and George on the outside. Mrs. George testified that after they had gone to sleep she was aroused by her husband speaking and witnessed the attack which resulted in his death. Mrs. George testified that she tried to protect her husband from his attacker, that her husband tried to get out of bed and fell back in the position in which he died.

The deceased had five separate wounds on his head, caused, according to the doctor, by blows from some sort of a hammer. One of the wounds caused his death. He had also several wounds on his body. He had a wound on his right ring finger or knuckle and a swollen lip; these latter wounds, according to the physician, were several hours older than the head wounds.

Mrs. George positively identified the defendant as the assailant. She says that, after she was able to get out of bed, she put on shoes and a wrap and secured her husband's money from his pants, and sometime during these minutes hid it in a pillow, where it was later found by the officers. She says the defendant required her to go with him to find his shoes up near a corn patch, that they then returned, where he compelled her to enter the trailer and submit to intercourse. She testified that she then went to the near-by railroad station and reported the crime to the man on duty. This fixes the time of the murder at about 3 a. m., September 12, 1941. She told the agent that the crime had been committed by a tall, well-dressed man who had a black moustache, and that he was accompanied by a short man. She remained there until the officers were called and returned to the "shack" with them. She told the officers of the tall man, but later repudiated the story and said she was told by the defendant to tell it and was afraid to do otherwise.

There is some controversy about how the assailant entered the "shack." The screen door was not fastened. There was a tear in the burlap at the end of the aisle between the two beds. Mrs. George testified that it was not there before the murder. The defense produced witnesses indicating that it was made some days or weeks before. The sheriff saw tracks made by some one either in bare or stocking feet just outside of the "shack" by that torn place.

Other than the direct evidence of Mrs. George, there was evidence connecting the defendant with the crime. The defendant and Mrs. George had been acquainted for some time. She says that he had on two or three occasions suggested that she go to Kansas with him and be his housekeeper and that she had refused to do so. She says that defendant knew that George had some money and that on the day before the murder George had sold two hogs for cash. On the evening before the murder the defendant called at his brother's home sometime between 9 and 10 o'clock and, as testified to by the brother, the defendant told him that he had just had a fight with George; that he had "rolled him" and that the fight was provoked by things that George had said about the defendant and Mrs. George. Mrs. George denied that any such fight occurred. Both the brother and his wife testified that the defendant also borrowed a ball peen hammer from his brother that night, stating that he wanted to use it to set a saw the following day and that he took the hammer with him when he left that evening around 10 o'clock. The defendant told the sheriff that he had borrowed a claw hammer from his brother and stated that it had a long homemade handle; this description does not fit the one in evidence. No such hammer was found at any of the places suggested by the defendant. Defendant, on the day following the murder, went to work cutting logs in the timber near Plattsmouth as usual. His movements were testified to. He did not set a saw that day before his arrest, and the evidence did not indicate that he had occasion to do so.

Mrs. George testified that after the assault the defendant picked something round off the bed and put it in his pocket

and was hunting for something else and told her he was hunting a hammer handle. A hammer handle, broken near the head, was found on the floor in articles near the head of the bed the following day. The hammer head was not produced. The brother's wife identified the handle as that of her husband's hammer, which had been loaned to the defendant. The shirt which the defendant was wearing the night of the crime was not found. Overalls identified as those which he was wearing the morning after the crime had blood stains upon them, but the expert was unable to say whether or not it was human blood.

The defense was an alibi. As to the time of the crime, it consisted of the testimony of the defendant's daughter who stated that her father slept that night at her home, apparently in the same room with her and her husband, that she was up four times after 11 o'clock with a sick baby and was awake on other occasions, and that on every occasion her father was in bed and asleep. He was there when officers came about 5:30 a. m. to get him. He was later released and again arrested about noon the same day.

Several statements which the defendant made to the officers when they were investigating the offense were related to the jury and checked and evidence offered tending to disprove their truth.

In all of the evidence there are many contradictions.

The defendant waived a preliminary hearing. The information was filed in the district court on September 24, 1941. Preliminary to the trial defendant made an application for a change of venue. This was overruled. He then challenged the array. This was overruled. He then moved for a continuance over the term. This was overruled. He assigns these matters as error requiring reversal.

The daily newspaper at Nebraska City carried the usual amount of publicity, including statements made by the defendant, the widow and others, and reported also on the coroner's inquest which was concluded prior to the filing of the information. The application for a change of venue was based on the proposition that all of this publicity had made

it impossible for the defendant to have a fair trial in Otoe county. The state made a showing by over 200 affidavits of citizens from various sections of the county, all to the effect that the affiants saw no reason why the accused could not have a fair and impartial trial in Otoe county. The securing of these affidavits, the defendant charges, further inflamed the passion and prejudice against him.

The challenge to the array is based on the proposition that the trial jury for the regular September term had been chosen and called at the time the murder was committed, that they were in Nebraska City and about the courthouse during parts of these preliminary proceedings and must have been affected by the publicity and public clamor against the defendant. It is further based on the proposition that one O'Connell who was a member of the trial jury panel was called and served as a member of the coroner's jury; that on September 22 he served as a juror in the trial of a case and was then discharged from further jury service; and that of necessity he must have told others on the panel about the evidence before the coroner's jury. It is further based on the proposition that the sheriff, whose name was indorsed on the information as a material witness against the defendant, aided in drawing and impaneling the jury; and that his deputy, also a witness, subpoenaed the jury and had charge of them at times. Because of all of these matters, the defendant contends that the entire jury panel was disqualified.

On October 8 the county attorney secured permission to indorse the names of 28 additional witnesses on the information. The defendant moved to continue the case over the term. All of these motions of the defendant were denied on October 8 and the case set for trial October 14.

On October 8 it was stipulated that in addition to the names on the regular panel additional names sufficient to make 24 in the panel should be selected by lot from the jury list submitted by the county commissioners and that 12 others should be selected from the same list to act in the capacity of talesmen should they be needed. The trial began

October 14 at 9 a. m. The jury was secured that day and 13 of the state's 20 witnesses testified before 5 p. m. that afternoon. The *voir dire* of the jurors is not shown. The record does, however, contain the statement of the trial court that out of the 36 prospective jurors so made available but 29 were examined and that the defendant "started waiving on your second, third and fourth challenge." It does not appear that there was difficulty in securing a fair and impartial jury, satisfactory to the defendant at the time of the trial. Nor does it appear that there was anything illegal or improper in the selection of the array or the relation of the sheriff and his deputy to it. This court has held: "It is not error to overrule a challenge to the array that does not plead facts showing in what way the statute regulating the manner of drawing the jury panel was violated." *Uerling v. State,* 125 Neb. 374, 250 N. W. 243. There is no showing that the defendant's rights were in any wise jeopardized, nor does he make a showing that he was in any wise prejudiced by the trial during the term it was held, nor that he was unable to properly prepare his defense before the trial began. We see no error in the court's order denying these motions.

Defendant's next assignment of error is that the verdict is not sustained by the evidence. This is based on the argument that the state's evidence is unsatisfactory, conflicting, unbelievable, and that the defendant's defense of an alibi was proved. We have reviewed the evidence. That murder in the first degree was committed is clear. The evidence pointing to the defendant as the murderer, if believed by the jury as it evidently was, is sufficient to support the jury's verdict. The defendant did not testify in his own behalf. He elected to allow the evidence of Mrs. George, his brother and sister-in-law and others to go to the jury undenied and unexplained by him and of necessity undenied and unexplained by others. He relied upon his defense of an alibi. The jury believed the witnesses for the state. They obviously did not believe his alibi defense. To determine such disputed questions of fact is the function and duty of the jury.

The defendant next argues that the court erred in admitting exhibits 1 and 4 in evidence. Exhibit 1 is a photograph showing the deceased lying dead on his bed, the bed and a part of the room. Exhibit 4 shows a part of deceased and a part of the bed and the torn burlap in the side of the "shack." These pictures were taken by flashlight shortly after the officers arrived and show the scene as they found it. The pictures were identified by the officer and the photographer before being admitted in evidence. They show that a crime had been committed and the condition of the body when found by the officers. The defendant, citing *McKay v. State,* 90 Neb. 63, 132 N. W. 741, and *Flege v. State,* 93 Neb. 610, 142 N. W. 276, contends that these pictures served only to excite the minds and inflame the passions of the jury. They do not connect the defendant with the crime, save that exhibit 4 was used to show where the hammer handle was found and to show the opening in the burlap. However, the pictures are evidence not only to show that a crime was committed, but also the degree of that crime. These were issues for the jury to determine. They enable a better understanding of the controverted issue of the torn burlap and the place of entrance of the assailant and the place where the hammer handle was found. They were properly admitted within the holding that, when such evidence has no tendency to establish the guilt or innocence of the accused and is effective only to inflame the passions of the jury, it should not be received; when, however, evidence of this character tends to throw light upon or illustrate any controverted issue, then it is admissible. *Muzik v. State,* 99 Neb. 496, 156 N. W. 1056, and *Egbert v. State,* 113 Neb. 790, 205 N. W. 252.

Defendant next argues that the admission of a pair of overalls in evidence was prejudicial error. The overalls in question are striped overalls. Defendant's brother testified that defendant had on striped overalls the evening before the crime. At that time, the brother says, there were blood stains on the defendant's shirt, but we find no mention of blood on the overalls; defendant told one of the witnesses

that he was wearing these overalls the night before the murder. The defendant had on these overalls the day of the crime when he was arrested the second time. The overalls were exhibited to the witnesses; the expert demonstrated how he determined that there were blood spots upon them; the sheriff identified them; the court received them in evidence, then excluded them after the expert testified on cross-examination that he did not know whether or not the spots were human blood or when the blood got there. They were then offered with the indications of the blood spots removed. In the light of these circumstances, we see no prejudicial error in the admission of the overalls.

Defendant next argues that the admission of the hammer handle in evidence was prejudicial error. This is predicated on the fact that it was not found until some time after the crime and when relatives and friends were cleaning up the "shack" (that it was found in the "shack" is not questioned in the evidence); that finger prints and palm prints were not taken and that the identification by the defendant's sister-in-law was not positive. When shown the handle she testified that she had seen it "a couple or three days before" the murder, that she saw the defendant take the hammer away from her home. She described and pointed out identification marks and said she was "almost positive" it was the same hammer handle that was on her husband's hammer. As we see it, sufficient foundation was established to permit the exhibit to go to the jury. The argument presented goes to the weight that body should give to the testimony.

Defendant next argues that the court erred in denying his motion for an instructed verdict of not guilty. We have already determined this matter in considering the sufficiency of the evidence.

Defendant next assigns as error the giving of the following instruction: "You are instructed that in order to warrant a conviction on circumstantial evidence, the circumstances, taken together, should be of a conclusive nature and tendency, leading on the whole, to a satisfactory conclusion,

and producing, in effect, a reasonable and moral certainty that the accused, and no one else, committed the offense charged ; and it is the invariable rule of law that, to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with the guilt of the party charged, and as cannot, upon any reasonable theory, be true, and the party charged be innocent; and in this case, if all the facts and circumstances relied upon by the state to secure a conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, then the jury should acquit the defendant."

Defendant's objection to this instruction is that it does not strictly follow the language long used by this court and last stated in *Watson v. State*, 141 Neb. 23, 2 N. W. (2d) 589, that the word "facts" is omitted once (although included twice along with "circumstances") ; that "should" and not "must" is used (although "must" is used in the following clause) ; that "a" is used instead of "such;" that the court used (but should not have used) "nature and tendency" "leading" to a "satisfactory conclusion" and "producing" in "effect" a "reasonable and moral certainty;" and that the court should have used "necessary" and "essential" and "competent evidence beyond a reasonable doubt;" that the court erred in referring to an "invariable rule of law" when it did not state it as it has heretofore been stated ; that it should not have used "circumstantial evidence *alone*" because there was direct evidence in this case also. These objections are a mere play on words. If, as defendant argues, the use of the word "alone" told the jury "they could disregard all the direct evidence," then the instruction was quite favorable to the defendant in that it would tell them to disregard the testimony of Mrs. George identifying the defendant as the assailant of her husband. We see no error prejudicial to the defendant in the instruction.

The defendant next argues that the court in advising the jury as to the crime charged used the word "feloniously" in the instruction and did not define the word. Error is not pointed out, and we see none.

Defendant next argues that the court should not have instructed the jury as to the elements of murder in the first degree and contends that the evidence does not justify the instruction. We have already determined that question in considering the sufficiency of the evidence.

Defendant next argues that the court should not have instructed as to murder in the second degree as "the state did not prove murder in the second degree," citing *Clark v. State,* 131 Neb. 370, 268 N. W. 87. The cited case does not support the contention. There the jury were instructed on murder in the first and second degrees, when the evidence supported only a finding of manslaughter. Here the evidence justified the jury in finding the defendant guilty of murder in the first degree. We do not understand how defendant could be prejudiced by the jury's being instructed in such a way as to enable them to find him guilty of the less serious offense. In *Hopt v. Utah,* 110 U. S. 574, 4 S. Ct. 202, it appears that the defendant, if guilty of the crime, was guilty of murder in the first degree. The court, however, held that "it was for the jury * * * to say whether the facts made a case of murder in the first degree or murder in the second degree," and that it was proper for the court to instruct the jury as to the statutory definition of murder in the first and second degrees. See, also, *People v. Thiede,* 11 Utah, 241, 39 Pac. 837. If the trial court by this instruction opened the door and made it possible for the jury to find the defendant guilty of murder in the second degree and escape the penalty which the law imposes for murder in the first degree, it was not error prejudicial to the defendant.

The defendant next argues that the court erred in refusing to give requested instruction No. 17; that where the state "advances a theory or claims that the murder was committed in a certain manner or with a certain weapon then the state must prove beyond a reasonable doubt not only that the defendant may have had such weapon, but that is the weapon and the only weapon used * * * and unless you find beyond a reasonable doubt that the defendant had a hammer and that the murder was committed by a blow of the

hammer such as the state claims the defendant had, then your verdict should be one of not guilty." The defendant cites no authority to support his contention. In *Olive v. State*, 11 Neb. 1, 31, 7 N. W. 444, the defendants were found guilty of killing "by means to the jurors unknown." There was some evidence as to how the deceased was killed. In that case this court said:

"It not unfrequently happens in cases of homicide that the condition of the remains of the deceased is such that it is absolutely impossible to know with reasonable certainty by which of several means life was taken, while there is no doubt whatever as to who was the guilty party. In such a case a count of the description of the one now under consideration enables the jury to find a verdict, when if it required them to agree upon the particular instrument or means used by the slayer, they might be unable to do so.

"While in our opinion the evidence would support a finding that death was caused either by hanging or shooting, it is not so clear by which mode as to warrant us in saying that, in this respect, the verdict was unjustifiable."

In *Long v. State*, 23 Neb. 33, 41, 36 N. W. 310, the indictment charged the commission of the murder with a "bludgeon." The court instructed the jury that if the death was produced by striking "with a bludgeon, bolt, or club" it would be sufficient. This court there said: "The testimony failed to show the character of the instrument with which death was produced, the body of the deceased being almost entirely consumed by fire, the house in which she resided being burned over her body at the time of her death. There was some proof tending to show the description of an iron bolt or club soon after the death of deceased. * * * It is not essential that the testimony should prove the instrument to be the identical one charged, providing the death was produced in substantially the same way." The rule is stated in 2 Wharton, Criminal Evidence (11th ed.) 1810, as follows: "The trend of modern decisions, it will be found, is to the effect that the substance of homicide being the felonious killing, proof of any killing in any manner or by any means

that conform substantially with the indictment is sufficient." The state charged in the information that the defendant "did strike, beat, wound and maim" the deceased, that he died "as a result thereof," and that the defendant "thus committed murder in the first degree." The information makes no reference to the instrument with which the wounds were inflicted. The state established by uncontroverted evidence that the wound causing death could have been made with a hammer such as was shown to have been in the possession of the accused a few hours prior to the murder. To require the state to prove that that hammer and that hammer only was the one used in the commission of the murder would be to hold that a murderer could escape the penalty of his crime merely by concealing the nature or the exact identity of the instrument with which he committed the assault. The state is not required to carry such a burden. The instruction was properly refused.

Finally, the defendant contends that the court erred in refusing to give a tendered instruction to the effect (1) that the defendant and no other person committed the crime; (2) that it was committed in the manner and with the weapon that the state contends; and (3) that the murder might have been committed by some other person or in some other manner or with some other weapon than that which the state claims was used and, if so, then they should find the defendant not guilty. This requested instruction contains two propositions, separately stated in (1) and (2) and consolidated in (3). Proposition (1) was fully covered by instruction No. 3 given by the court. There is no dispute in the evidence as to the "manner" in which the murder was committed. The proposition as to the "weapon" has been decided in connection with tendered instruction No. 17. The court did not err in refusing to give this instruction.

Section 29-2308, Comp. St. 1929, provides: "No judgment shall be set aside, or new trial granted, or judgment rendered, in any criminal case on the grounds of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or proce-

dure, if the supreme court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred." Pursuant to the above provision of the statute, we have examined the entire cause and have determined that no substantial miscarriage of justice has actually occurred and that error prejudicial to the defendant did not occur.

The judgment is affirmed.

AFFIRMED.