JAMES CONNOLLY V. STATE OF NEBRASKA.

FILED SEPTEMBER 20, 1905. No. 13,867.

1. **Instructions: REVIEW.** It is not error to refuse to give instructions requested by the defendant on the law of self-defense, if the court has already by instructions given on his own motion properly submitted that question to the jury.

2. ———— : ————.  It is not error to refuse an instruction correct in principle, where the evidence is not such as to make it applicable.

3. **Improper Statements of Counsel: REVIEW.**  Alleged improper statements of counsel, made while arguing a case to the jury, to be available on error, must have been objected to at the time they were made and the ruling of the court invoked thereon; and the record of such statements, together with the objections thereto and the ruling of the court thereon, must be preserved in the bill of exceptions.

ERROR to the district court for Sioux county: WILLIAM H. WESTOVER, JUDGE.  *Affirmed.*

*R. C. Noleman, Fred Wright, Grant Guthrie* and *M. F. Harrington,* for plaintiff in error.

*Frank N. Prout, Attorney General,* and *Norris Brown, contra.*

BARNES, J.

On the 15th day of March, 1904, the plaintiff in error, James Connolly, shot and killed one Henry H. Miller, in Sioux county, in this state.  He was tried for the crime on an information charging him with murder in the first degree, and was found guilty of manslaughter.  From a judgment sentencing him to imprisonment in the state penitentiary for a term of eight years he prosecutes error. On the trial it was admitted by the accused that he shot and killed the deceased, and he defended himself against such action on the ground of justifiable homicide.  There are seventeen assignments of error in his petition, but in his brief and on the oral argument only three of them were relied on for a reversal of the judgment of the trial court.  The record discloses that the accused introduced some evidence tending to show that the deceased was a man of violent temper and quarrelsome disposition; that he had made some threats against the accused, both communicated and uncommunicated; that the accused had been well and intimately acquainted with the deceased for

about twelve years, and that the deceased was approaching him in a threatening manner at the time he fired the fatal shot.

It is contended that the court erred in refusing to give the jury an instruction, tendered by the accused, submitting his theory of self-defense. The instruction tendered specifically directed the attention of the jury to the evidence tending to show the bad character and violent temper of the deceased. This instruction was refused for the reason, as stated by the trial court, that he had already instructed the jury on his own motion in relation to that matter. The record discloses that paragraphs fifteen and sixteen of the court's instructions properly submitted the question of self-defense as applied to the evidence above mentioned. In the latter part of paragraph sixteen the court said: "The rule in such cases is this: What would a reasonable person, a person of ordinary caution, judgment and observation, in the position of the defendant, seeing what he saw, and knowing what he knew, suppose from this situation and these surroundings? If such reasonable person, so placed, would have been justified in believing himself in immediate danger, then the defendant would be justified in believing himself in such peril, and in acting upon such appearance." Having given the instruction above quoted, the court properly refused to give the instruction tendered by the accused. Where the substance of an instruction asked for has been given by the court on his own motion, the party tendering the instruction cannot complain of its rejection by the court. *Bush v. State,* 47 Neb. 642; *Carrall v. State,* 53 Neb. 431.

The accused further contends that he had the right to shoot and kill the deceased in order to prevent the commission of a felony, and that the court erred in refusing to give an instruction tendered by him presenting that theory of his defense to the jury. In order to determine this question, it is necessary for us to give at least a summary statement of what was shown by the evidence

introduced at the trial. It appears that the accused had in some manner obtained possession of a steer claimed by the deceased; that he had had possession of the animal for some length of time prior to the tragedy; that the deceased had knowledge of his possession of the animal, and that on the 14th day of March, 1904, the accused and the deceased were in the town of Alliance; that the accused there learned that the deceased was going to get the steer, and thereupon he started for his ranch, rode nearly all night, and arrived at home at about three o'clock on the morning of the 15th; that before noon of that day he armed himself with a Winchester rifle, mounted what was called a "buckskin" pony, rode to the ranch of his neighbor, Swanson, where the steer then was, drove it home and placed it in his own herd. About noon of the 14th inst. the deceased, accompanied by one Harry Dash, started on horseback from Alliance to find and bring away the steer in question. On the first day after leaving Alliance they reached the ranch of one Ellmore, about nineteen miles west and a little south of that place. They stayed there over night, and left Ellmore's ranch the morning of the 15th, at seven o'clock. From there they went to what is called the "Swanson Ranch," which they reached in the forenoon. They looked over the cattle on the Swanson ranch in search of the steer, but did not find it. At that time they saw a man driving an animal away. The man was riding a buckskin horse, and was going in an easterly direction toward the ranch of the accused. Thereupon the deceased and Dash started in the direction of Connolly's place, which was distant about a mile and a half southeast. After arriving at the ranch they looked among the cattle, and there found the animal they were searching for. After finding the steer, they rode over south of the ranch, and then east, and then came back to the windmill situated near the barn. It appears that their purpose in riding about the ranch was to find the accused. Not finding him, the deceased went up to the ranch house to see one Rea, who was working there, to

get some grain for the horses. Afterwards he came back, and about this time they noticed a buckskin horse down in the draw by some boulders or rocks, the reins of the horse's bridle being fastened to the rocks. They then rode down to where the horse was standing, but saw nothing of the accused at that time. They then rode back to the corral, and put their horses in the barn, where they fed them. After coming out of the barn, they saw the accused on a knoll southeast of the corral, about 200 yards distant, in a crouching position on his hands and knees, apparently crawling on the ground and looking toward them. It appeared to them that he crouched lower after he saw they were looking his way. When the deceased saw Connolly, he started to go out where he was. When he came within 50 or 60 yards of him, the accused fired the shot that almost instantly killed the deceased. It appears that during all the time intervening between the time Miller left the barn and until he was shot by the accused he was seen and observed by Harry Dash; that he was a one-armed man, 63 years of age, and at the time of the tragedy had no weapon of any kind on his person. The evidence of the state shows that before the shot was fired no conversation had taken place between the deceased and the accused; and that immediately before the shot was fired the arm of the deceased was swinging by his side. It further appears that the accused, after he had shot the deceased, immediately left the scene of the tragedy.

The foregoing facts are not disputed, except in so far as the evidence of the accused differs from the evidence of the state as to what took place at the time the tragedy occurred. Connolly testified in his own behalf, in substance, as follows: "I looked up. I had taken off my shoes to take some cactus out, or my boot, rather, and I looked and saw Mr. Miller in about 50 or 60 feet of me. He said: 'What are you doing there?' And I said: 'I am here attending to my business. What are you doing here?' He said: 'I am here after that steer (pointing to where

there was a bunch of cattle).' I said: 'That is my steer, Miller, and you can't take him without you have an officer, or a writ of replevin.' He was walking right along toward me, slowly. He said: 'You go in the house and stay there until I take this steer.' I said: 'I will do no such thing. I will stay here and see that you don't take the steer.' He said: 'Damn you, I will fix you right here.' He run his hand in his pocket, and ran right toward me.' When he was within about 20 feet (my gun was lying beside me), I jerked it up and shot quick, like that."

It is apparent from the foregoing evidence, given by the accused himself, that at the time he fired the fatal shot the deceased was neither in the act of committing, nor was he about to commit, a felony. He was not attempting to take possession of the steer in question, and even if he had made such an attempt, openly and under a claim of ownership, he would not have been guilty of a felony. Nay, more than that, even if he had succeeded in taking forcible possession of the steer under a *bona fide* claim of ownership (and it is not shown or contended that his claim was not made in good faith), he would not have been guilty of a felony. His offense, at most, would have been no more than a trespass. So the evidence of the accused did not even tend to support his claim that he fired the fatal shot to prevent the commission of a felony. It is true that the defendant in a criminal case is entitled to have his theory of his defense submitted to the jury by proper instructions. But there must be at least some evidence to support such a theory before it can be submitted. There was no evidence in this case which would support the instruction tendered, and it was, for that reason, properly refused.

Lastly, it is contended that a new trial should be granted for misconduct of the prosecuting attorney. We find attached to the transcript a couple of affidavits made by counsel for the accused, in which are set forth certain statements alleged to have been made by the county at-

torney in arguing the case to the jury. These statements or strictures, however, if they may be called such, were of a mild nature, and it is doubtful if they were at all prejudicial to the rights of the accused. Again, the record fails to show that they were objected to, or that the trial court was asked to make any ruling thereon. To make such statements available, they must be preserved in the form of a bill of exceptions. *Wright v. State,* 45 Neb. 44; *Korth v. State,* 46 Neb. 631; *Holt v. State,* 62 Neb. 134. The affidavits above mentioned are not preserved in or made a part of the bill of exceptions, as required by the authorities above cited, and for that reason we have no authority to consider them.

From an examination of the whole record we are satisfied that the accused was given a fair and impartial trial. Indeed, every doubtful proposition seems to have been resolved in his favor. He was allowed to introduce evidence of the character and disposition of the deceased, without regard to its competency, and we are impressed with the idea that the evidence in this case would have sustained a conviction for a higher degree of crime than manslaughter. In fact, it is apparent that the accused ought to be well satisfied with the verdict of the jury and the judgment and sentence of the court.

There being no reversible error in the record, the judgment of the district court is hereby

AFFIRMED.