JAMES JONES, JR., v. STATE OF NEBRASKA.

FILED JUNE 29, 1910. No. 16,537.

1. **Homicide:** APPEAL: PREJUDICIAL ERROR. In a prosecution for murder, a conviction should be reversed for the erroneous admission of irrelevant evidence which is prejudicial to defendant.

2. **Criminal Law:** INSTRUCTIONS: COMMENT OF COURT. In charging the jury in a criminal prosecution, it may be error for the trial court by oral comment or other means to unduly emphasize the fact that part of the instructions are given at the request of defendant, and that the others are given by the court on its own motion.

ERROR to the district court for Chase county: ROBERT C. ORR, JUDGE. *Reversed.*

*W. S. Morlan,* for plaintiff in error.

*William T. Thompson, Attorney General,* and *George W. Ayres, contra.*

ROSE, J.

In the district court for Chase county the county attorney filed an information against James Jones, Jr., defendant, charging him with murder in the first degree. A jury found him guilty of manslaughter, and the district court sentenced him to serve a term of six years in the penitentiary. As plaintiff in error he now presents for review the record of his conviction.

Defendant shot and killed Joseph B. Rowley, March 25, 1909, and at the trial for murder resisted conviction on the ground of self-defense. Rowley and defendant had

lived on adjoining farms in Chase county for a number of years. At one time they were on friendly terms and jointly furnished posts and two wires for about 80 rods of division fence on the southern boundary of defendant's pasture. This fence had separated their possessions for six or seven years. When each was keeping a stallion in March, 1908, a barn owned by Rowley was burned. There is proof tending to show: Rowley accused defendant of burning his barn and threatened him with violence. The accusation and threats were communicated to defendant. Rowley organized a vigilance committee of 20 men who waited on defendant at his home April 1, 1908. On this occasion Rowley appeared with a shotgun which he had carried across his saddle in front of him and accused defendant of the barn-burning. The latter indignantly denied the charge and earnestly protested his innocence, but indicated a willingness to test his prowess with his accuser. Violence was averted, but at a subsequent meeting of the committee Rowley proposed to visit defendant's place and shoot up his house. A witness advised Rowley against taking his men there again, and afterward on April 14, 1908, received by mail a note purporting to come from the vigilance committee and warning him to leave the affairs of the mob alone. One house in the neighborhood was shot up. At different times before the tragedy defendant appealed to the county attorney for protection from Rowley and the vigilance committee, but that officer, after having heard complaints from both sides of the controversy, advised against commencing legal proceedings. Defendant also applied to the governor and attorney general for protection, and was referred to the county attorney as the state's prosecuting officer in Chase county.

On the morning of March 25, 1909, without notice to defendant, Rowley hitched a team to a wagon and drove in his own field to the west end of the division fence south of defendant's pasture. He took with him two shotguns, a Winchester rifle and a revolver. He was accompanied by two sons, one named Richard, age 23, and the

other named Henry, age 19. They attached the west end of one of the fence wires to the rear of the wagon and drove the team eastward along the fence, pulling the staples, throwing posts into the wagon, allowing the wire attached to the wagon to drag behind, and leaving the other wire on the ground. When they were thus engaged, defendant, unarmed, approached across his pasture on foot. In describing what followed, Richard testified that after about 40 yards of fence had been taken down he saw defendant coming. His own language, referring to defendant as "Jim," is in part: "Jim come down and says: 'You fellows want a shooting scrape?' Father says: 'No, I want my fence.' Jim says: 'I got a Winchester.' Father says: 'Go get it;' and he went." Henry's testimony was substantially the same. The proofs show without contradiction that the senior Rowley displayed one of the shotguns. Defendant's version of what took place at this meeting is stated in his own words as follows: "I went out there, and he was tearing the fence down; and I hollowed to him to let the fence alone. I went on up there close to him and got within 30 or 35 yards of him, and he grabbed a gun and came towards me, leveled it at me, and came over the fence two or three steps. I says: 'Oh, I guess you want a shooting scrape;' and he said yes he did, to go and get my gun." Other details were given by the witnesses, and, in so far as there is a conflict in the testimony as to what was said and done at the first meeting after Rowley began to take down the fence, the story told by Richard and Henry at the coroner's inquest appears to coincide more nearly with defendant's testimony at the trial than with their own. Defendant left the Rowleys at the work described and went in a northeasterly direction to his house. After they had taken down the fence to a point as far east as a gate near the southeast corner of defendant's pasture, defendant returned in a wagon with his brother Arthur. Richard testified that defendant, when approaching in the wagon, carried his rifle across his knees, came within 150 yards, and got off in

the open on the south side of his wagon; that the Rowleys went behind their wagon box which had been extended in height on the south side by boards used during corn-husking; that defendant shot four times, twice when standing and twice when in a crouching position with his rifle resting on his knee, the first and second shots going over their heads, the third splintering the wagon box, and the fourth killing the senior Rowley instantly. Richard also testified that his father used his rifle and fired the first shot, shooting five times in all, some of the shots being accidental and all going wild, but that he did not shoot until after defendant had raised his gun. Richard, according to his own testimony, fired twice with a shotgun and once with the rifle after his father was killed. In the main this testimony was corroborated by Henry's. The sum of defendant's story of the shooting is: After the colloquy in the morning defendant went home, hitched his team to a wagon, loaded posts, wire and tools and started out to rebuild the fence which the Rowleys had taken down. Defendant sat in the left end of the seat with the lines in his hands. The gun was in the front end of the wagon-box at the right side, leaning against the posts, with the stock down. Defendant drove southward from his home, followed a road to a point north of the gate where the Rowleys were at work, and turned toward the southwest. When traveling in that direction in the manner described, and away from the Rowleys, they commenced shooting at him from a distance of 100 yards or more. He saw their guns pointed at him and smoke coming out of the barrels. He put his arm up to his face for protection and received a shot in the back of his hand. A bullet whistled over his head when his wagon was in motion, and he immediately threw down the lines, grabbed the rifle, and jumped out of the wagon on the south side, the team moving on and turning to the right. He fired four shots, and was standing when he fired the first three. The first and second were fired over Rowley's wagon, and the third at it. When the fourth was fired

he was in a crouching position with his gun leveled and his arm resting on his knee. This testimony was practically the same as his brother's. He and Arthur rebuilt the fence the same morning, and returned to the house a little after noon. A neighbor who met them when they returned testified there was a shot-mark on the front end of the wagon and a number of shot-marks on the left side of the box near the front end.

Was defendant fired upon in his own field, when lawfully engaged in farm work? Was the deceased Rowley the agressor? Was self-defense a justification for the homicide? Who told the truth? The determination of these questions imposed upon the jury a perplexing duty. Four persons who witnessed the tragedy testified at the trial. Two were sons of the deceased person and one of them participated in the shooting. While admitting their father fired the first shot, they said defendant, when 150 yards away, first raised his gun to shoot. The other eyewitnesses were defendant and his brother, and each testified to having been shot before the fire was returned and before any threatening move had been made by defendant. The four eyewitnesses would naturally feel a keen interest in the result of the prosecution. The testimony is voluminous, and in the brief outline here given no attempt has been made to determine any question of fact or the weight of any item of evidence. Some facts of which there is proof, however, have been narrated for the purpose of determining whether errors apparent on the face of the record were prejudicial.

The following letter was admitted in evidence over the objection of defendant, and the ruling is vehemently assailed as erroneous: "Blanche, Neb., Oct. 20, 1909. Mrs. Rowley: Please keep your boys off my place and away from my haystacks and out of my pasture. I saw them there and I will put up with it no longer. Yours truly, James Jones, Jr." The state of course makes no attempt to justify the admission of this letter as evidence of defendant's guilt, but the attorney general argues that it is

in the handwriting of defendant, and was properly admitted for the purpose of comparison in showing the genuineness of another letter in which defendant acknowledged that Rowley had an interest in the division fence. This reasoning cannot be adopted to justify the ruling of the trial court. Neither the state in offering the letter nor the trial court in overruling the objection to it limited its consideration to the purpose of comparison. It was identified as substantive proof to be considered in determining defendant's guilt, and was read to the jury as such. There was no instruction directing the jury to consider it only for the purpose of showing the genuineness of other letters written by defendant. It was written more than six months after the homicide. It was clearly irrelevant and was erroneously admitted. Was it prejudicial to defendant? Two sons of the deceased Rowley testified that the defendant was the aggressor. This was the vital question when defendant's life was in the balance. Defendant and his brother testified that Rowley was the aggressor. In this situation the jury would look outside of the conflicting testimony of the eyewitnesses to other proofs for defendant's motives and propensities, and would find in the letter quoted, when unexplained, a disposition on his part to be unkind or cruel to the widow and orphans he had made. The logical effect of this irrelevant evidence was to prejudice defendant in the minds of the jury. Under the circumstances of this case, it cannot be said that the error in overruling the objection to the letter was not prejudicial, though such a ruling would ordinarily be harmless error in a different record. Other letters which were likewise irrelevant were also admitted in evidence over the objection of defendant.

Defendant also complains of the manner in which the instructions requested by him were given to the jury by the trial court. For an acquittal defendant relied on self-defense and most of the instructions requested by him related to the law on that subject. He requested 14 instructions, and all of them were given, but the trial court in

reading them introduced each with the following oral
statement to the jury: *"At the request of the defendant
I instruct you as follows."* After the jury had been thus
reminded 14 times that the instruction being given was
requested by defendant, the trial court addressed them as
follows: "Gentlemen of. the jury, *the court on its own
motion instructs you."* Then followed the first instruc-
tion given by the court on its own motion. Seventeen
more, consecutively numbered, were also given, and each
was prefaced by the following remark from the bench: "I
further instruct you as follows." Those given at the re-
quest of defendant were further distinguished from the
others in the presence of the jury by being pinned together
in a separate package which was indorsed by the judge,
"Requested by defendant." This method of charging the
jury and of emphasizing the fact that some of the in-
structions were given at the request of defendant and that
others were given by the court on its own motion is criti-
cised as erroneous and prejudicial. The attorney gener-
al's reply to the argument is that defendant himself identi-
fied his instructions, and in consequence requested the fol-
lowing which the trial court gave: "The instructions given
by the court at the request of the defendant have been
examined and approved by the court, as truly stating the
law applicable to this case, and it is your duty to give
such instructions the same weight and consideration as if
given by this court on its own motion." This instruction
is no justification for the action of the trial court in intro-
ducing those that preceded it with the oral statement:
"At the request of defendant I instruct you as follows."
Defendant's purpose in requesting the instruction quoted
was to give those preceding it equal rank with the in-
structions given by the court on its own motion, but there
is nothing in the record to indicate that it made a greater
impression on the jury than the oral announcement which
the court repeated from the bench 14 times: *"At the
request of defendant I instruct you as follows."* The sit-
uation was further complicated by an instruction in which

the jury were directed to "found their verdict solely on the evidence as given on this trial and the *instructions of the court.*" That the jury were in doubt as to the relative importance and dignity of the different instructions is conclusively shown by the record. After they had deliberated 20 hours, without coming to an agreement, they directed the following inquiries to the trial judge: "Can the jurors ask the court for instructions concerning the instructions that we already have got? Are we not to consider all of the instructions and render a verdict therefrom, and no one part?" These questions were answered by the court as follows: "The jury is instructed that they should take and consider all the instructions given them on this trial, in reaching their verdict, and not any part thereof."

For instructions the jury properly look to the court. Did the instructions on the law of self-defense emanate from the court or from defendant who was urging self-defense as a justification for the homicide? Should the instructions given at the request of defendant on that subject be considered? Why should the jury debate these questions among themselves? It is proper to indicate by the record the instructions given at the request of each party, but the better practice forbids the mentioning of such matters to the jury. It is improper for the trial court to emphasize the fact that some of the instructions given were requested by defendant and that others were given by the court on its own motion. The practice followed in this case has often been condemned by reviewing courts. In discussing this question, the supreme court of Illinois said: "The instructions should go to the jury as the instructions of the court, and the better practice is to have nothing appearing on the instructions showing at whose instance they are given." *Aneals v. People*, 134 Ill. 401.

The instructions requested by defendant were in some measure at least discredited by the manner in which they were submitted to the jury, and in the other instructions

the law on the subject of self-defense was not as fully or accurately stated as it should have been. While the manner in which the jury were charged might not amount to error in many cases, the peculiar circumstances of the present case lead to the conclusion that it was error prejudicial to defendant.

For the reasons given, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.