JAMES MCMARTIN V. STATE OF NEBRASKA.

FILED FEBRUARY 13, 1914.   No. 18,109.

1. **Bribery:** PUBLIC OFFICER. A county attorney is a public officer within the meaning of section 176 of the criminal code.

2. **Criminal Law:** INSTRUCTIONS. Instruction No. 2 examined, and set out in the opinion, *held* not prejudicially erroneous.

3. **Bribery:** SUFFICIENCY OF EVIDENCE. Evidence examined, and set out in the opinion, *held* sufficient to sustain the verdict.

4. **Criminal Law:** INSTRUCTIONS: COMMENT OF COURT. Upon concluding its charge to the jury, the trial court in the hearing of the jury announced: "The instruction asked by defendant is refused." *Held* not prejudicial error.

5. ———: MISCONDUCT OF PROSECUTING ATTORNEY: EXCEPTION. The rule is settled in this state that misconduct on the part of a prosecuting attorney in the trial of a case or in his argument to the jury must be objected to and exception taken to the ruling of the court in order to obtain a review in this court.

6. ———: INSTRUCTIONS. The rule announced in *Keezer v. State*, 90 Neb. 238, in relation to a cautionary instruction as to the testimony of officers, whose duty it is to pursue, arrest and prosecute criminals, reaffirmed.

7. ———: EVIDENCE: MOTION TO STRIKE. A motion to strike an entire answer of a witness "as hearsay and not responsive" is properly overruled where a separate and distinct part of the answer is not vulnerable to the motion.

ERROR to the district court for Sarpy county: HARVEY D. TRAVIS, JUDGE. *Affirmed*.

*A. E. Langdon*, for plaintiff in error.

*Grant G. Martin, Attorney General*, and *Frank E. Edgerton*, contra.

FAWCETT, J.

Defendant was convicted in the district court for Sarpy county of the crime of attempting to bribe the county attorney of that county. From such conviction he prosecutes error to this court.

For the sake of brevity plaintiff in error will be designated in this opinion as defendant. The several errors argued for reversal will be considered in the order in which they appear in defendant's brief.

1. "The indictment did not contain statements sufficient to constitute a cause of action." This point is not argued and will not be considered.

2. Section 176 of the criminal code "is void because of indefiniteness, and does not include or refer to a prosecuting attorney, or any attempt to bribe such officer." The argument upon this point is that the law is void as to the matter of attempting to bribe a county attorney, in that it does not point out what officer, if any, is intended to be referred to; that section 176 "refers to 'county officer', not 'a county officer.'" We are unable to grasp the distinction. Section 176 provides: "Every person who shall offer or attempt to bribe a public officer and every public officer who shall solicit a bribe or who shall propose or agree to receive a bribe in any case shall be fined in a sum not exceeding five hundred dollars ($500) nor less than three hundred dollars ($300) and shall be imprisoned in the penitentiary for the period of one year." If a county attorney is a public officer, which is too plain to admit of a doubt, he is included within this section of the criminal code.

3. "The court erred in giving instruction No. 2." Instruction No. 2 is a literal quotation of section 176 of the criminal code. The objection to the instruction is that the court should not have included that part of the section which provided that "every public officer who shall solicit a bribe or who shall propose or agree to receive a bribe in any case shall be fined," etc. It is said that there was no evidence on which to base this portion of the instruction; that it was sufficient to instruct the jury on the law as to offering or attempting to bribe a public officer; that the inclusion of the language last above quoted had a tendency to confuse the jury; that the jury may have conceived the idea "that Judge Begley, a popular officer, elected by the people, may have been accused of

having solicited a bribe, or having proposed or agreed to receive a bribe, and for the purpose of protecting him from blame it became essential to convict the defendant." We do not think the instruction could have had this effect, and we cannot say that it was erroneous.

4. "The verdict is contrary to the evidence and is not sustained thereby." The evidence against the defendant consisted largely of the testimony of the county attorney, corroborated to some extent by the testimony of Mr. Chase, who held the office of sheriff. The evidence shows that the offices of the sheriff and county attorney were in adjoining rooms in the courthouse; that on the day alleged the defendant called at the courthouse to see Mr. Begley, the county attorney. At the time he called, Mr. Begley was in his office, but was engaged in conversation with the county attorney of Saunders county; that defendant took a seat in Mr. Chase's office to wait until he could have an interview with Mr. Begley; that while in Mr. Chase's office he said he wanted to see the county attorney; to quote Mr. Chase's language: "He said he wanted to see the county attorney—see him alone so his word would be just as good as the county attorney's." When Mr. Begley's visitor departed defendant was admitted. Mr. Begley testified: "Mr. McMartin came into my office, and he said, 'I have come to see you about a matter, and I am going to talk plain.' He says, 'There has been all kinds of rumors down in Fort Crook as to what you are going to do, what you are going to do when you got in, and I came up to see you. We are all up in the air. There are reports down there that you have got the dope on all of us.' I said, 'Mr. McMartin, I have the dope on all except you. I have sent a man down there, and have found out about everybody else, but I haven't anything against you.' Mr. McMartin said, 'I am glad of that. I have been arrested once, and just finished paying the fine.'" He further testified that, when defendant asked him what he was going to do, he answered: "I said, 'You know what the law is with reference to selling at Fort Crook, with reference to selling within two and a half miles of a

military post.' He says, 'We know that.' I said, 'That is all the advice on the matter I can give you.' He says, 'Would you let me get by for $150 a month.' I said, 'No, sir; I wouldn't let you get by for any amount.' He says, 'You can go down there and find out my reputation, and that I have always run a good place down there.' He says, 'We can't sell unless we have some protection.' I stated that I would make no arrangements with him; that I didn't consider they were entitled to run, and if I got the evidence on him I would surely prosecute him, and if he continued to run I would get the evidence." He further testified: "After I told Mr. McMartin that I refused to take anything, he said, 'You are a fool if you don't get it. Everybody gets it. There is nothing in this office except the money, and you might just as well get the money. The people down there all want saloons, and there will never be anything said.' He said, 'All you have to do is just to let us go by, and nobody will ever bother you if you don't bother us.' * * * I said, 'When I went into office I knew what the salary was. If I don't like the salary I can resign.' * * * We then talked further about some matters, and finally he returned to the subject. He said, 'You take this $150 a month and don't be foolish about it. Nobody will ever know anything about it. All we are after is the money anyway. These fellows want their beer, and we consider the law isn't good down there.' I said, 'No, sir; I refuse to take any money, and don't want to hear any more of the proposition. You have got to obey the law if you don't want to get into trouble.' Mr. McMartin then started to go, and he said, 'Come down and have a drink with me.' I said, 'No; I am busy and don't care for anything.' He said, 'Come down and have a cigar.' And I said, 'I don't care for any.' As he started to go by the desk, he reached down in his pocket and pulled out a purse and opened it. When he opened it I saw that it contained a good deal of gold. He pulled out a five-dollar gold piece and threw it on the desk. He said, 'Take this and have a good treat on me.' I said, 'No; take your money, you don't owe me anything. I haven't ren-

McMartin v. State.

dered you any service.' He said, 'Go ahead and take it.' I said, 'No; come back and get your money, it is your money.' He walked out and left the money lying there on the table." This testimony is in part contradicted by defendant, and the $150 a month attempted to be explained by his testimony that what he was seeking was to have some arrangement made by which he and others, who were selling around Fort Crook, might pay a certain stipulated amount in the way of fines and thus avoid prosecution. He testified: "I says, 'Ain't there some way where they can be fined and let them run?' I said, 'The farmers like a glass of beer when they come to town.' I says, 'Ain't there some statute where they can be fined, and still keep going?' 'No;' he says, 'there ain't.' I says, 'I understand down in Iowa they have got a law where they can be fined;' and he says, 'They have got a different law in Iowa. There is no such law in the state of Nebraska.' I says, 'If there is no such law in Nebraska, there is no use talking about it; let's quit talking about it; and we sat down and talked on general topics; never said nothing about that transaction. I had bothered him talking with him so long that I felt kind of foolish, and I said, 'Begley, come down and have a cigar.' He says, 'I haven't got time.' I stuck my hand down in my pocket, and I thought I gave him a quarter, but he claims I gave him a five-dollar gold piece; the transaction was all over; the talk was all over; there was no dickering afterwards. I got up and walked out of the door."

In connection with this assignment we will consider defendant's assignment that the court erred in admitting in evidence the five-dollar gold piece above referred to. It is argued that it was not shown that this money was given for purposes of attempting to bribe; that Judge Begley himself stated that it was given for purposes of treating; that the sum was insignificant, and when the larger sum was not considered there could be no presumption that the insignificant sum was left for an illegal purpose. We do not think the court erred in admitting the gold coin in evidence. The jury had a right to determine

McMartin v. State.

the probability of defendant's having done the improbable thing of throwing out a five-dollar gold piece, thinking it was a "quarter." Moreover, the testimony of Mr. Begley was that defendant took the five-dollar gold piece out of a purse containing a large quantity of gold. The leaving of the gold coin on Begley's desk over the latter's protest was so closely connected with the offer of $150 a month as to make it a part of the same transaction, and would tend strongly to show that defendant realized that he had made a mistake, had approached the "wrong man" with his offer of a bribe, and that he was endeavoring as he left to mollify "his man" with a liberal treat. Taking the testimony, therefore, as a whole, the defendant's declaration in advance to Mr. Chase that he wanted to talk to the county attorney alone, so that his word would be just as good as that of the attorney, the unqualified testimony of Mr. Begley as to the offer of the bribe, his unqualified denial of the testimony of the defendant that defendant's talk was along the line of paying a stipulated fine similar to the Iowa law, and the gold coin episode at the end of the interview, were sufficient to satisfy the jury, as it has us, beyond a reasonable doubt, that the defendant was guilty.

5. The next complaint is that, when the court had finished reading its charge to the jury, it announced to counsel in the presence and hearing of the jury the following language: "The instruction asked by defendant is refused." This did not constitute reversible error, nor does *Jones v. State,* 87 Neb. 390, cited by defendant, so hold.

6. It is next urged that the case should be reversed because of remarks made by Attorney W. R. Patrick, who was conducting the prosecution, in his closing argument to the jury. No objection was made to the language at the time it was used, nor any ruling of the court requested. The only objection appearing in the record is in the motion for a new trial, and in the affidavit of defendant's counsel in support thereof, which recites that Mr. Patrick in his closing argument "uttered the following language

with a great deal of force, viz.: 'It is your duty to return a verdict of guilty, and, if not, it is (or will) be your duty to make a report to the court that Judge Begley is guilty of perjury, and recommend that the matter of his perjury be presented to the grand jury of Sarpy county,' or words almost identical, and to that full effect." We have frequently held that misconduct must be objected to and exception taken to the ruling of the court before it will be considered in this court. *Bradshaw v. State,* 17 Neb. 147; *McLain v. State,* 18 Neb. 154; *Hill v. State,* 42 Neb. 503; *Catron v. State,* 52 Neb. 389; *Connolly v. State,* 74 Neb. 340; *Goldsberry v. State,* 92 Neb. 211. In *Clark v. State,* 79 Neb. 482, we held: "It is only in the most flagrant cases of the use of improper language by a prosecuting attorney, even in the prosecution of capital offenses, that defendant's counsel can apparently acquiesce in the language used by remaining silent until the trial is finished, and then cause the trial and verdict to be set aside by complaining of statements to which he seemed at the time to consent." Even if it were to be conceded that the language of Mr. Patrick was somewhat outside of the pale of legitimate argument, we cannot say that it was such a flagrant case of the use of improper language as to call for a reversal under the circumstances shown.

7. It is next argued that the court erred in refusing the only instruction tendered by defendant. The instruction reads: "The jury are instructed that, in considering the testimony of an officer, or officers, whose duty it is to pursue, arrest, and prosecute criminals, you should consider it with caution, because of the tendency of such officers to hear and remember those portions of conversations and evidence against the defendant, and not hear or remember such portions as may be in favor of the defendant." This instruction was properly refused for two reasons: (a) Mr. Chase was not testifying as to anything which occurred at a time when he was acting in his capacity as a sheriff. He was simply testifying, as an ordinary citizen, to a conversation had with the defendant prior to the time the crime was committed. (b) In

*Keezer v. State,* 90 Neb. 238, we distinctly held that the rule announced in the proposed instruction "will not ordinarily apply to a county attorney, a sheriff, or to his deputy."

Finally, it is argued that "the court erred in not striking out Mr. Begley's answer to question No. 129, which follows No. 131." Counsel has these two questions transposed. On cross-examination counsel for defendant, by question No. 129, asked Mr. Begley: "Didn't you tell Mr. Rushart you had sent down six or seven times to catch Mr. McMartin, to get evidence against him, but failed to do it? A. When and where? (130) Q. Along about this time? A. No; I don't recall of having told Mr. Rushart that. (131) Q. Along about the time you sent Mr. Hamilton down there? A. No, sir; I don't recall of telling anybody about sending any one down there. Since the day Mr. McMartin was at my office, I remember Mr. Rushart's coming up there and telling me that he heard a conversation over the 'phone where Mr. McMartin was coming up to offer me money. MR. LANGDON: I move to strike the answer out as hearsay and not responsive. THE COURT: Overruled. Exception." In this ruling the court did not err. The motion is to strike the entire answer. The first sentence was clearly responsive to counsel's question, and not hearsay; hence, the motion was bad and was properly overruled. Moreover, since counsel had asked Mr. Begley about a conversation with Mr. Rushart, it was not an abuse of discretion for the court to permit an answer to remain in the record which told what the conversation actually was that he had had with Mr. Rushart.

AFFIRMED.

SEDGWICK, J., not sitting.

HAMER, J., dissenting.

1. I am not able to concur in the majority opinion, although quite willing to concede its plausibility and strength of argument. I conceive it to be the duty of this court to grant a new trial in a criminal case where it is

apparent that the trial has been unfair, and that the defendant in the case has been prejudiced by the fact of such unfairness. The defendant was charged with attempting to bribe a public officer, the county attorney of Sarpy county. Section 176 of the criminal code, under which the defendant was prosecuted provides: "Every person who shall offer or attempt to bribe a public officer (and every public officer who shall solicit a bribe or who shall propose or agree to receive a bribe in any case) shall be fined in a sum not exceeding five hundred dollars ($500) nor less than three hundred dollars ($300) and shall be imprisoned in the penitentiary for the period of one year." The part of the section which I have included in parentheses relates to the public officer who *solicits a bribe or proposes to receive one.* It was enough for the court to have quoted that part of the section relating to an *attempt to bribe* a public officer, and it was wholly unnecessary to encumber the jury, and perhaps confuse it, with that part of the section which I have included in parentheses. The danger was that the jury, fancying there was an issue between the county attorney and the defendant, might deem it necessary to find the defendant guilty in order to express their faith in the county attorney. Of course, the county attorney and the defendant were to some extent arrayed against each other concerning just what was said; and, when the trial judge put *foreign matter* into his charge which tended to create an issue between the county attorney and the defendant, it must have been calculated to confuse the jury as to what was the *real* issue. This was further aggravated by what the able and zealous prosecutor, Mr. Patrick, said. He was *specially* appointed to prosecute. It is undisputed that he said to the jury: "It is your duty to return a verdict of guilty, and, if not, it is (or will) be your duty to make a report to the court that *Judge Begley is guilty of perjury,* and recommend that the matter of his perjury be presented to *the grand jury of Sarpy county.*" It is easy to imagine the florid and forensic force which accompanied this impassioned outburst. It was a "foul" in the contest which cannot be

justified.  The legal game should be fair, always fair.  The jury could not help being influenced by the judge and the prosecutor co-operating together; the one instructing the jury on a subject which did *not come before them,* that is, telling what the penalty might be for the one who *solicited the bribe,* and the prosecutor emphasizing the idea that it was their *duty,* if they *failed to find the defendant guilty, to report the case to the grand jury against Begley.*  It is said in the majority opinion that that sort of misconduct must be objected to and exception taken to the ruling of the court at the time it is made or that it will not be considered by this court.  I do not think the rule is uniform; but the better authorities give a new trial if the misconduct is likely to have done an injury.  It should be remembered that, if counsel for the defense should arise in court to object, he does so at the risk of the prosecutor saying:  "I told you so.  That is where the shoe pinches."  As certainly as counsel object, just so certainly they hurt their case with the jury, and counsel for the state should not be allowed to burden the defense with the task of making an objection which is certain to injure the defendant.  A technical rule which tolerates the mistreatment of the prisoner in the presence of the jury deserves no defense.  And to maintain the right to put a burden on the defendant which is sure to injure him whatever course he pursues seems to the writer indefensible and cruel.  It is like throwing stones at one who is swimming for shore.

In *Carr v. State,* 23 Neb. 749, the present chief justice, delivering the opinion of this court, said:  "It cannot be believed that, in this advanced age of our jurisprudence, any court could be found who would permit such conduct, without visiting the severest penalty of the law upon the parties indulging in such actions.  It matters not how guilty a defendant may be of crime, our constitution and laws guarantee to him a fair trial."

In *Leahy v. State,* 31 Neb. 566, the defendant was on trial for rape, alleged to have been committed on one Lizzie Schultz.  On cross-examination the defendant was asked if on the day succeeding that on which it was al-

McMartin v. State.

leged he committed the crime he did not go to the residence of one B, and, there finding the daughter of B. alone, he did not attempt to drag her to a lounge. And counsel then said to the court, in the presence of the jury: "'We intend to follow this matter up, and show that he went right over to B.'s, and there tried to kiss and hug Miss B. and drag her to the lounge;' Miss B. having been summoned as a witness for the state, and being then present in the court." Judge Maxwell, delivering the opinion of this court, said: "It was error, therefore, for the prosecuting attorney to make the statement which he did in the presence of the jury. * * * He acts in a semijudicial capacity, and is supposed to act alone from principle and without bias or prejudice. The state has guaranteed to every one a fair trial, and such trial cannot be had if the prosecution can resort to tricks to secure a conviction."

In *Elliott v. State,* 34 Neb. 48, there was a reversal of the judgment, because the county attorney in the cross-examination of the defendant asked him certain questions which were of a prejudicial character. "Q. Is it not a fact that you stole horses in Burnett county, Texas? A. I never did; no, sir. Q. Don't you know that the sheriff has a warrant for you for stealing a horse in that county? A. I don't know it; no, sir." An examination of the original bill of exceptions, now on file in the office of the clerk of the supreme court, shows that no objection was made to these questions and no exception taken. It is not claimed in the original brief of the plaintiff in error, also on file in the same office, that there was any objection. This court, by Judge Maxwell, said: "The emblem on every courthouse, of justice holding the scales in equipoise, would be a meaningless symbol if even one of the poorest and most abject of humankind was unjustly deprived of a right." It will be seen that the district judge made no ruling of any kind. He was not asked to do so. *The reversal was simply because of misconduct of the county attorney.* The following cases are along the same line as *Elliott v. State, supra; Chicago, B. & Q. R. Co. v. Kel-*

*logg,* 55 Neb. 748; *Ashland Land & Live Stock Co. v. May,* 59 Neb. 735; *Nickolizack v. State,* 75 Neb. 27; *Ashland Land & Live Stock Co. v. May,* 51 Neb. 474.

In *Chicago, B. & Q. R. Co. v. Kellogg, supra,* it was said in the body of the opinion: "We do not, however, wish to be understood as holding that a rebuke from the court, or a complete retraction by the offending counsel, is in all cases of this kind a sovereign remedy. *If the transgression be flagrant—if the abusive remark has stricken deep,* and is of such a character that neither rebuke nor retraction can entirely destroy its sinister influence—a new trial should be promptly awarded, *regardless of the want of an objection and exception.*" In that case a reversal was not granted because of misconduct of plaintiffs counsel; but the court said: "We have concluded  *  *  * that the damages are excessive, and must have been assessed while the jury were yet under the sway of counsel's superheated eloquence." A reversal was ordered, unless there was a remittitur for $2,500, or leaving the judgment to stand affirmed for $6,500.

In *Ashland Land & Live Stock Co. v. May,* 59 Neb. 735, it was said in the body of the opinion: "We have little patience with counsel who deliberately seek to achieve success by lawless methods; and we do not hesitate, *in any case, to deprive them of advantages thus obtained.*" In the syllabus of that case it is said: "Where there is reason to believe that the jury may have been influenced in any degree in favor of the prevailing party by the *misconduct of his counsel in arguing the cause,* the verdict should be set aside and a new trial awarded."

In *Ashland Land & Live Stock Co. v. May,* 51 Neb. 474, it is said: "In no instance did the trial judge rebuke counsel for plaintiff on account of his misconduct, nor was he directed to desist from using improper language, nor was the jury, either at the time, or in the instructions, admonished not to be influenced by them. The misconduct of counsel for the *prevailing party in this case could not have been otherwise than prejudicial to the defendant,*

especially in view of the conflicting character of the evidence."

In *Nickolizack v. State, supra,* the accused was a witness in his own behalf in a rape case, and the prosecuting officer on cross-examination asked him, in substance, "if he had not at a previous time been guilty of a like offense upon another young girl, naming her, and other like questions, and thereafter called the person named to the witness-stand and examined her, for the purpose of not only impeaching the accused but of proving him guilty of such independent offense; *held,* that such conduct was improper and prejudicial, for which the *accused should be granted a new trial."*

In *Ashland Land & Live Stock Co. v. May,* 59 Neb. 735, it is said: "When this case was here before, a judgment in favor of the plaintiff was set aside because of the pernicious tactics of his counsel; and we would certainly reverse the judgment *now* under review, if there were reason to suppose that the jury were *at all influenced in giving their verdict by the statements in question."* It will be noticed that it is not a question of whether objection has been made. It is the flagrant wrong done by counsel for the prosecution that determines the action of this court.

In *Stratton v. Nye,* 45 Neb. 619, counsel for the defendant made the charge in his opening address to the jury that the defendant Nye was the owner of one-half interest in a corn sheller, and that he "sold that half interest to Mr. Gilchrist, and after this he came to town and mortgaged the same half interest which he had sold to Gilchrist." While there was an objection in that case, this court said: "The court should, especially when objection is made, reprove the parties in the hearing of the jury, and as far as possible remedy the mischief by instructing the jury to disregard the prejudicial statements." It will be noticed that the court does not confine the right of the injured party to such cases as those in which he has made objection. *He is entitled to the relief whether he made objection or not.*

In *Martin v. State,* 63 Miss. 505, the assistant prosecuting attorney said in his argument to the jury: "Martin * * * is a man of bad, desperate, and dangerous character. But I am not afraid to denounce the butcher boy, although I may, on returning to my home, find it in ashes over the heads of my defenseless wife and children." There was no objection to this, and no exception, and the presiding judge did not interfere. The judgment was reversed. The supreme court said: "It is the duty of the presiding judge, as stated in *Perkins v. Guy,* 55 Miss. 153, and *Cavanah v. State,* 56 Miss. 299, to interfere of his own motion to prevent a breach of the privilege of counsel, and if he fails to do so, and the abuse of privilege is of such character as to produce the conviction that injustice resulted therefrom, the duty of this court is to apply the corrective by awarding a new trial."

"The worst criminal is entitled to be judged by the laws; and, if his conviction is secured by means of a perversion of the law, the injury to the cause of public justice will be more serious and lasting in its results than his being allowed to escape altogether." Cooley, Constitutional Limitations (7th ed.) p. 478.

In *McKay v. State,* 90 Neb. 63, the court quoted briefly the language of Chief Justice Christiancy in *Hurd v. People,* 25 Mich. 405. "The only legitimate object of the prosecution is 'to show the whole transaction, as it was, whether its tendency be to establish guilt or innocence.' The prosecuting officer represents the public interest, which can never be promoted by the conviction of the innocent. His object, like that of the court, should be simply justice; and he has no right to sacrifice this to any pride of professional success." In that case Judge Fawcett, in dwelling upon the fact that the court permitted Mr. M. F. Harrington to assist in the prosecution, said: "The mere fact that the court permitted Mr. Harrington to assist in the prosecution cannot be held to be a compliance with the statute which provides that private counsel may be procured by the county attorney under the direction

95 Neb. 20

of the court.    This provision of the statute calls for af-
firmative action by the county attorney and the court."
The judgment of the court below in that case was reversed,
apparently because the prosecution was not considered to
have been fairly conducted, and it was not considered that
Mr. Harrington had been properly employed.

It is well to remember that it is a serious thing to go to
the penitentiary even just one year.   Mr. Harrington went
into the case of *McKay v. State,* 90 Neb. 63, at the "re-
quest" of the county attorney, at least the county attorney
was not unwilling, and by "the order of the court   *   *   *
is permitted to assist the county attorney in the prose-
cution of this case."    Now the substantial objection to
Mr. Harrington was the *private interest* he had in the
case, being employed and "paid by the brothers and sis-
ters of the deceased."    This same objection to private
counsel is further emphasized in *Flege v. State,* 93 Neb.
610, where it is held that "no attorney should be appointed
who is known to be a partisan as against the accused, and
who has theretofore been employed and paid by another
suspected person."    If the doctrine applied to the *Mc-
Kay* and *Flege* cases, and which seems mainly responsible
for their reversal, should be applied to the instant case,
it is difficult to see how McMartin had a fair trial, be-
cause Mr. Patrick had a *private interest* to sustain by
securing McMartin's conviction, not a private interest
existing because of fees which had been paid him in some
other proceeding, but Mr. Patrick was not the county at-
torney of Sarpy county, and he was in the case as Mr.
Harrington was in the *McKay* case, and as private coun-
sel was in the *Flege* case, by request of other counsel, and
by permission of the court, and he had a *personal interest*
in the enforcement of the amendment of which he was the
author.   We quote from page 295, chapter 81, laws 1907:
"(Senate File No. 295.    Introduced by Mr. Patrick.)
An act to    amend    section 25 of chapter 50 of the
Compiled Statutes of Nebraska for the year 1905 (C.
A. S. 7175) and to repeal said original section."    The
act contains this clause, which is the part of the act pre-

pared by Mr. Patrick: "Provided, that no license shall
be granted by the authorities of any village for the sale
of any liquor within two and one-half miles of any United
States military post." Rev. St. 1913, sec. 3869. In speak-
ing of the relation of private counsel to the duties of a
prosecutor in *Flege v. State, supra,* Reese, C. J., says that
it is impossible to conceive of an attorney, situated as he
was, entering "upon the trial with the single purpose of
impartially seeking to know the truth, protecting the rights
of defendant, and seeing that they were maintained, if
need be, at all hazards." The journal entry shows that
the district judge appointed Patrick because "the county
attorney is the prosecuting witness in the case." Some
one had to be appointed as prosecuting attorney for that
case, and ordinarily no one could take exception to Mr.
Patrick; but when he became a prosecutor, under the
amendment which he drew, it is not at all strange that his
zeal carried him beyond the calm discussion of the facts
to imaginary duties that required the conviction of Beg-
ley as a perjurer if the defendant should not be found
guilty. He was not after Begley; he was after McMar-
tin.

The great danger was that the zeal of the private prose-
cutor in a liquor case where *his amendment* to the law
was on trial for the first time, and the zeal of the witness
who felt that his honor was at stake, were such that to-
gether they defeated justice. I have read all the evidence.
If Judge Begley's evidence is to be analyzed and com-
pared with the other testimony, the case is essentially
weak. No doubt Judge Begley testified just as he felt
and saw; but he may have looked through colored glasses,
and he may have been unduly sensitive. In any event
Begley's testimony should be considered as a *whole.* It
should not stand *alone upon his conclusions.* The defense
is that McMartin did not intend to offer a bribe to any
one. He testified in a manly way, and apparently without
concealment. He admitted that he was selling liquor with-
out license. He says that he told Judge Begley so; and
Begley admits it. He says he wanted to know of Beg-

ley if they could not agree on a sum to be fined, and still keep going. He told Begley that "Patrick is the cause of that law. He was the father of the bill." Judge Begley no doubt knew that. It should be remembered that the adoption by the legislature of the Patrick amendment to the liquor law meant a "dry" spot about Fort Crook five miles in diameter, and that as the spirit of the amendment was not in accord with the other parts of an act, which was in favor of *local option* the farmers and other people in the vicinity of the Fort may have complained. The amendment was probably unpopular with very many people besides the officers and soldiers of Fort Crook. McMartin probably had the sympathy of the community, which may have considered that its rights were invaded by the unpopular amendment which had not been voted upon by the people of the locality or their representatives. The public may have expressed their approbation of McMartin's place of entertainment. There seems to have been three other places of the same kind. McMartin should not be prejudiced in the bribery case by his conduct in selling liquor, although that may have deserved punishment. He told Begley: "The people didn't vote for this law, but it was forced on them without their consent, and you can't blame them for violating it." "I says, 'Ain't there some statute where they can be *fined,* and still keep going?' I said, 'The farmers like a glass of beer when they come to town.' * * * I says, 'I understand down in Iowa they have got a law where they can be *fined.*'" McMartin testified: "Q. When you asked him (Begley) if the parties could be made to pay fines that would go to the county, what did he say? A. He said it couldn't be done—there was no law to that effect. I says, 'They do it in Iowa.' He says, 'They have got a different law in Iowa.'" Why did they talk about Iowa if they were not talking about adopting the Iowa plan, and if they talked about adopting the Iowa plan what necessity was there for such talk if it was just a plain case of offering to bribe? This supports McMartin's claim.

Judge Begley testified: "Q. Didn't Mr. McMartin also admit in his testimony down there that he was engaged in the traffic down there at that time? A. Yes, sir; on cross-examination. Q. Did McMartin say anything in the lower court as to his object in trying to get fines for himself and two other fellows? A. Yes, sir; he said in his testimony on cross-examination that he came up there to see me for the purpose of offering to pay me a fine of $50 apiece for himself and two other gentlemen to operate down there continually." Judge Begley only admits the truth of part of McMartin's testimony, and that is that McMartin admitted that he was then engaged in the liquor traffic. Judge Begley's testimony, fairly considered and taken altogether, might have acquitted the defendant under impartial conduct by Mr. Patrick.

2. In *Langdon v. Clarke,* 73 Neb. 516, this court set aside the verdict where the district court had instructed the jury that *words of provocation may be considered in mitigation of damages* where there actually *were no* words of provocation. Langdon had been struck by Clarke with his fists, and sued Clarke to recover damages for the assault. The only testimony of anything said by Langdon prior to the time when he was struck was that he (Langdon) was not a liar, that he was not afraid, and that the plaintiff could not make him run. We quote from the opinion: "There was no evidence of any words used by the plaintiff which the jury were entitled to take into consideration in mitigation of damages. Hence, this portion of the instruction was not warranted by the evidence, and was, we think, prejudicially erroneous. The jury may well have thought the words used were proper to consider in mitigation of damages, and in consideration thereof reduced the recovery to nominal damages, and by reason of the request of counsel hereinbefore discussed rendered a verdict for the defendant instead of for reduced damages." The instruction as quoted in the brief in the instant case is: "Where there is no evidence of provocative words, it is error to instruct the jury that mere words of provocation are not sufficient to justify a person in committing an as-

sault and battery upon another, but the words may be considered in mitigation of damages."

3. Grant Chase, the sheriff, testified on behalf of the state that he had a conversation with McMartin in his office when McMartin was waiting to see the county attorney, Judge Begley; that McMartin said: "He wanted to see the county attorney—see him alone so his word would be just as good as the county attorney's." He was then telling the sheriff of the county that he was going to talk to the county attorney about something of a criminal character, and that, if the county attorney should testify about it, there would be his testimony against the testimony of the county attorney as to what was said. McMartin apparently did not consider the proposed subject of enough importance to be very secretive about it, or he would not have been telling the sheriff, whose duty it is to arrest offenders, and to assist in procuring them to be punished. The way that McMartin talked to the sheriff tends to show that he came to see the county attorney for the purpose of preventing a future prosecution for selling whiskey without license. He was willing to close up if the county attorney wished him to do so. It is shown by the questions asked that the prosecutor asked the defendant many questions with a view to emphasizing the fact before the jury that he was *guilty of selling liquor without license,* and that he had been convicted of *that offense.* Questions 162, 163, 164, 165, 166, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, and 178 show the purpose to emphasize *such* conviction. Question 180 is directed to the inquiry as to whether the defendant paid $12 a month for the privilege of illegally selling liquor without license. Mr. Patrick also inquires if the *other* "bootleggers" at Fort Crook did not pay the village $12 a month *for the privilege.* The effort to try the defendant on some *other* charge than that contained in the information was rather persistent, and could not well have been otherwise than prejudicial. *Kanert v. State,* 92 Neb. 14.

The attorney for the defendant requested the giving of the following instruction, which was refused: "The jury are instructed that, in considering the testimony of an officer, or officers, whose duty it is to pursue, arrest, and prosecute criminals, you should consider it with caution, because of the tendency of such officers to hear and remember those portions of conversations and evidence against the defendant, and not hear or remember such portions as may be in favor of the defendant." This instruction or one of like character should have been given. *Kastner v. State,* 58 Neb. 767; *Sandage v. State,* 61 Neb. 240, 87 Am. St. Rep. 457. The interest of a police officer in securing the conviction of the person he prosecutes is usually not greater than the interest of a sheriff. The office which the man holds who does the work of ferreting out the evidence should not determine the question of his interest. That is determined by *what he does.* In the latter case it is said in the syllabus: "Where informers, detectives, or *other persons* employed to hunt up testimony against the accused are called to testify against him, he is entitled to an instruction to the jury that in weighing their testimony greater care should be exercised than in the case of witnesses who are wholly disinterested." An active sheriff, because of increased efficiency, is generally more dangerous to the defense than even an active policeman. He often has a wider range of vision, and, not infrequently, he is more in the habit of managing men with a view to securing results. The dignity of his office makes him nearly always in the employ of the state.